## Long Estate

*Patricia M. Jasper, Deputy Attorney General,* and *Louis J. Rovelli, Deputy Attorney General,* for petitioner

*John B. Rengier* and *Samuel T. Swansen,* for trustees.

*APPEL, P.J.,* January 5, 1978—The Attorney General of the Commonwealth of Pennsylvania has petitioned for an order (1) reforming the wills of Henry G. Long and Catharine H. Long to delete therefrom all restrictions on race and sex in the

admission of persons as residents of the Henry G. Long Asylum, and (2) requiring the Trustees of the Henry G. Long Asylum to administer the asylum in a manner consistent with laws prohibiting the asylum from discriminating in admissions on the basis of race or sex.

The petition to reform has been presented, according to the memorandum of law filed by petitioner, in view of the following:

"In their fifteenth report to the Orphans' Court of Lancaster County, covering the period October 1, 1971, to September 30, 1976, the trustees advise that the Long Asylum has been notified by the Pennsylvania Department of Health that the home is 'out of compliance' with Title VI of the Civil Rights Act of 1964 and with the Pennsylvania Human Relations Act and, in effect, that continued noncompliance will result in denial to the home by the Department of approval to operate.

"In light of these facts, the Attorney General of Pennsylvania herewith petitions the court to reform the wills of Henry G. Long and Catharine H. Long by applying the doctrine of cy pres to strike therefrom the restrictions on race and sex in the admission of persons as residents of the Henry G. Long Asylum and to order the trustees to administer the asylum in a manner consistent with laws prohibiting the asylum from discriminating in admissions on the basis of race or sex."

If the reformation sought by petitioner is to be effected, the language to which the change would mainly pertain is the following provision in the will of Henry G. Long:

". . . the net proceeds thereof . . . shall be appropriated and used as a means for establishing of a

single woman's asylum, in the City of Lancaster, in which respectable white women, from the City and County of Lancaster and [sic] indigent circumstances, above the age of forty-five years, being widows and single women, shall be admitted and maintained . . .''

The thrust of the petition is the removal of the references to white, to widows, and to women. These words would be replaced by the insertion of person, individual, adult, or a word similar thereto without modification thereof as to race.

Petitioner contends entitlement to the reformation sought based on the following:

1. Fair Housing Act of 1968
2. Pennsylvania Human Relations Act
3. Civil Rights Act of 1964
4. Civil Rights Act of 1866
5. Fifth Amendment to the Constitution of the United States
6. Fourteenth Amendment to the Constitution of the United States.

Henry G. Long and Catharine H. Long were father and daughter who died on March 5, 1889, and June 18, 1900, respectively. Henry's will provided a life estate for Catharine in certain assets. At her death, the remainder was to be used to establish an asylum as above set forth. Catharine's will provided bequests to the trustees to "be held and controlled by them under the same terms, provisions and restrictions, conditions and regulations as my father has imposed in his last will and testament with reference to the establishment and management of the said proposed Asylum."

It is obvious that Catharine's gift is a legacy to the trustees which has been consummated by delivery

to the trustees. We, therefore, deem that Henry's will is the sole instrument under which an asylum was to be established. It follows that reformation of Catharine's will would in no way bear on the operation of the asylum.

After the death of Catharine, the trustees erected a building called the Henry G. Long Asylum. The first occupants apparently entered the asylum on October 1, 1906. Quinquennially since then the trustees have filed accounts or reports concerning the operation of the asylum. An examination of these reports establishes that the trustees have vigorously and successfully pursued other funds. By cy pres the trustees have obtained significant additions to the endowment from the Jennie S. Potts Estate and the Ann C. Witmer Home and, also, have been made the recipients of income from the Mary C. Melson Estate. Additionally, the endowment was substantially increased by receipt of the Charles G. Baker and Miriam R. Baker Fund, the former of whom was for many years an active and dedicated trustee of the Henry G. Long Asylum.

Approximately 20 years ago, the trustees petitioned the Orphans' Court of Lancaster County for permission to invest certain of the endowment funds in real estate other than in first mortgages, as directed by the will of Henry G. Long and Catharine H. Long. The extensive opinion filed by President Judge T. Roberts Appel on January 21, 1948, states a variety of findings and principles which are pertinent to the determination of the matter now before the court. We quote therefrom as follows:

"At various times, as testified by the matron of the home, the home contained as many as 52 guests. At the present time the home houses 11 between 80 and 90 years of age, 24 from 72 to 77

years of age, and 5 from 62 to 68 years of age. There are four bed patients. . . . Since the home was opened, 206 guests have been admitted and have withdrawn; and the present resident list is 40 guests. When the home was originally opened, it was laid out for about 35 guests, but subsequently a parlor and infirmary were divided into rooms in order to accommodate the number of guests indicated. . . .

" . . .

"It appears to this court that . . . the primary purpose and intention of the wills of Henry G. Long and Catherine H. Long was the maintenance and support of a certain class of single and indigent women. This purpose and intention was a charity, and must be governed by charitable rules and regulations and principles of equity. The requirement and restriction on the investment of the endowment funds of said home . . . in first mortages . . . was not the primary purpose and intention of testator and his daughter. That was an administrative feature of the management of the trust funds in order to safeguard the same in the best security then known to testators.

" . . .

"In the instant case Henry G. Long appears to have been born on August 23, 1804, admitted to the courts of this county as a lawyer in the year 1827 and was subsequently elevated in 1851 to the bench of Lancaster County as its fifth president judge. His term expired on December 1871. It would appear to this court that mention should be made of the years of service rendered by Judge Long in this community in order to appreciate the great changes, socially, economically, scientifically, financially, judicially, and charitably that have occurred, not only

since a long period covered by the life of Judge Long, but from the date of the execution of his will, and thereafter for a period of half a century down to the present time. His essential purpose was charitable in character. It is the duty of this court, with such means as may be available, to see that his charity is carried into effect as may be done at the present time in view of the present circumstances and not to let it fail." Long Asylum Trustees' Petition, 63 D. & C. 284, 288, 290, 294.

The basis of petitioner's attempt to reform is (1) that operation of the Long Asylum on a racially and sexually restrictive basis violates the Fair Housing Act of April 11, 1968, 82 Stat. 81, as amended, 42 U.S.C.A. §3601 et seq., and the Pennsylvania Human Relations Act of October 27, 1955, P.L. 744, as amended, 43 P.S. §951 et seq., and (2) that operation on a racially restrictive basis violates the Civil Rights Acts and the amendments to the United States Constitution which have been cited. Upon the violations having been established, it is then contended that the court should apply the doctrine of cy pres.

## THE DOCTRINE OF CY PRES

The brief of petitioner contains the following discussion of cy pres:

"That the court has both statutory authority and common law equity power to apply cy pres and to order the administration of a trust in a manner consistent with law is beyond question. Section 6110 of the Probate, Estates, and Fiduciaries Code provides, in relevant part, as follows:

*"Except as otherwise provided by the conveyor,* if the charitable purpose for which an interest shall be conveyed shall be or become *indefinite or impossible or impractical* of fulfillment, . . . the court may, on application of the trustee or of any interested person or of the Attorney General of the Commonwealth, . . . order an administration or distribution of the estate for a charitable purpose in a manner as nearly as possible to fulfill the intention of the conveyor, *whether his charitable intent be general or specific.* (Emphasis added.)

"See also, Restatement of Trusts, 2d §399, the language of which is cited with approval in various cases, e.g. Wilkey's Estate, 337 Pa. 129, 133 (1940); Russ Estate, 20 Fid. Rep. 332, 334 (O. C. Dauphin 1970), and in re: Weaver Mathematical Scholarship Foundation, 9 Adams Leg. Jour. 67 (1967)."

Philadelphia v. Heirs of Stephen Girard, 45 Pa. 927 (1863), is an oft-quoted source of principles of cy pres and petitioner has selected the following as an expository statement of the doctrine:

"The rule of equity on this subject seems to be clear, that when a definite charity is created, the failure of the particular mode in which it is to be effectuated does not destroy the charity, for equity will substitute another mode, so that the substantial intention shall not depend on the insufficiency of the formal intention.

"And this is the doctrine of cy pres, . . . a reasonable doctrine, by which a well-defined charity . . . may be enforced in favor of the general intent, even where the mode or means provided for by the donor fail by reason of their inadequacy or unlawfulness."

In further amplification of the long and well-established doctrine of cy pres, we believe that but

one additional reference is requisite. The convergence of the doctrines of approximation and cy pres is apparent from the discussion in Kramph's Estate, 228 Pa. 455, 463, 77 Atl. 814 (1910), in which the court said:

"Under the general jurisdiction of a court of chancery to administer the estate of a charity, it has power to vary the precise terms of a charitable trust, when necessary. This rule is too well established to be doubted. It is thus expressed by Lowrie, C.J., in City of Philadelphia v. Girard's Heirs, 45 Pa. 9 [1863], 'When a definite function or duty is to be performed, and it cannot be done in exact conformity with the scheme of the person or persons who have provided for it, it must be performed with as close approximation to that scheme as reasonably practicable; and so, of course, it must be enforced. It is the doctrine of approximation, and it is not confined to the administration of charity, but is equally applicable to all devises and contracts wherein the future is provided for, and it is an essential element of equity jurisprudence.' "

## THE FAIR HOUSING ACT

In the Fair Housing Act of April 11, 1968, 82 Stat. 81, as amended, 42 U.S.C.A. §3601 et seq., the United States Congress has declared it unlawful to " . . . make unavailable or deny, a dwelling to any person because of race, color, . . . sex or national origin." 42 U.S.C.A. §3604(a). "Dwelling" is defined in the act as " . . . any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families . . . . " 42 U.S.C.A. §3602(b). "Fam-

ily" includes a single individual: 42 U.S.C.A. §3602(c).

It is apparent that if the Henry G. Long Asylum is a dwelling, then the provision of the will which is the foundation thereof is in conflict with the Fair Housing Act. The determination of the question is not by reference to usage, dictionary or otherwise. The act itself defines "dwelling." That is the definition which is here involved. Is the building in which the Long Asylum exists occupied as a residence by one or more families, bearing in mind that family, per the act, includes a single individual? Obviously families, i.e., single individuals, occupy the building. The only word which then remains undefined is "residence." In United States v. Hughes Memorial Home, 396 F. Supp. 544 (W. D. Va. 1975), the court noted that the word is not defined in the act and must be accorded its ordinary meaning. Webster's New World Dictionary, Second College Edition, 1970, defines residence as "the place in which a person or thing resides; dwelling place; abode; esp., a house." Reside is therein defined, "to dwell for a long time; have one's residence; live (in or at)." Can it be gainsaid that the individuals who occupy the asylum live in, have their residence or dwell for a long time within the edifice thereof? Black's Law Dictionary defines residence as a "factual place of abode." It is there stated that residence "requires only bodily presence as an inhabitant of a place."

In Hughes, supra, the court held that an orphanage set up by a will for white children of the States of Virginia and North Carolina violated the act. Although respondents have correctly stated that this court is not bound by the Hughes decision, we believe that the principles therein enunciated are sufficiently conclusive to dispose of the trustees'

contention that there existed a legislative intent to limit the act to the commercial housing market.

The trustees strenuously urge that the asylum comes within the exclusion for private clubs provided in section 3607, which states: " . . . Nor shall anything in this subchapter prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members."

The argument of respondents as stated in the brief filed on their behalf is: "The Long Home is in the nature of a private club. It is more like a private club than a commercial housing establishment which was the focus of this Act. The Long Home is a 'club' that is subsidized by its founder. In this regard the Long Home has characteristics similar to a fraternity or sorority which by charter states a perference for certain types of members and offers the benefits of membership, including facilities, to new members based on the ability to pay. Likewise, the lifetime membership fee is based on the ability to pay and entitles the member to all benefits of the 'club'—meals, medical attention, clothing, spending money and burial. It serves as a vehicle for people, with the aid of their benefactor, to band together to avoid the loneliness of old age and the helplessness of being impoverished."

The word "club" is not defined in the statute. Determination of its meaning is essential to resolution of entitlement to the exemption. The trustees' supplemental memorandum of law filed in response to petitioner's supplemental memorandum of law says that "the Attorney General plods on for fifteen pages in an effort to refute the trustees'

characterization of the Home as a private club." In spite of this thrust, we are hesitant to dispose of the argument by simply saying that the asylum is not a club. True it is that the asylum has admission standards relating to health, age, financial conditions, character, marital status, sex and geographical location that ae strictly enforced, as stated by the trustees. Do these ingredients make it a club?

Black defines "club" as "[a] voluntary, incorporated or unincorporated association of persons for purposes of a social, literary, or political nature, or the like." Webster, supra, contains the following: "a group of people associated for a common purpose or mutual advantage, usually in an organization that meets regularly." Common to both definitions is that people be associated. Our understanding of the association is that the entity consist of the individuals who are associated. In fraternities and sororities to which respondents have analogized the asylum, all of the individuals who comprise the entity are associated. Governance, standards, regulations, all are determined by those who make up the entity. Unlike fraternities and sororities, the Henry G. Long Asylum is composed of two groups. One group consists of those within whose purview is the determination of governance, standards and regulations. The other group consists of those who occupy the building. We deem the distinction to be fundamental. The existence of the distinction compels the determination that the Long Asylum is not a club.

Even if it be conceded that respondents' contention re club is correct, it is our opinion that the exclusion is not applicable for another reason. Section 3607 permits a private club to limit lodgings or

give preference to its members where the providing of lodgings is an "incident to its primary purpose or purposes." The providing of lodgings, the admission and maintenance of individuals in the building which has been erected is the sole purpose of the Henry G. Long Asylum. The fulfillment thereof is in no way incident to any other purpose. Without the existence of a separate primary purpose, the conclusion that the exclusion is inapplicable is inescapable.

For the reasons which have been stated the court concludes that the operation of the Long Asylum on a racially and sexually restrictive basis violates the Fair Housing Act of 1968, as amended. Since the operation is a violation of that act whereby the charity must otherwise fail because of that unlawfulness, it becomes unnecessary to consider whether the activity constitutes a violation of the Pennsylvania Human Relations Act, the Civil Rights Act of 1964, the Civil Rights Acts of 1866, and the Fifth and Fourteenth Amendments to the Constitution of the United States.

## APPLICATION OF CY PRES

In 1948, this court concluded that "the primary purpose and intention of the wills of Henry G. Long and Catharine H. Long was the maintenance and support of a certain class of single and indigent women. This purpose and intention was a charity . . ." The conclusion then reached, that the purpose and intention was a charity, remains today. We have concluded that the restrictions as to race and sex are unlawful. Although Judge Long specified white women, we are of the opinion that the general

charitable intention was to benefit individuals in indigent circumstances.

In 1948, Judge T. Roberts Appel addressed his attention to the question of the effect of the receipt of old age assistance in determining the indigency of an individual. He concluded that if the present or succeeding trustees, in the exercise of their discretion, would decide to adopt as a policy the admission of guests upon the payment of such old age assistance as may be provided, this conclusion would not be foreign to the purpose set forth in the will. Prefatory to his discussion, Judge Appel stated: "Since the death of Henry G. Long and the active life which he led in the community, a great change in the administration of charities of the character contemplated in his will appears to this court to have taken place in our community." 63 D. & C., at 296.

The change which was then noted has been a continuing one. Notwithstanding the conclusion that the specific intention that white women be benefitted cannot be fulfilled, it is essential that the failure of this particular mode shall not destroy the charity. We note that in the Girard Estate the Orphans' Court Division of the Court of Common Pleas of Philadelphia has recently deemed it necessary to attempt rectification of a partial failure of the purposes of that trust by ordering that "functional orphans" be admitted to Girard College. The court defined "functional orphans" as "boys whose natural parent or parents, in the judgment of the trustee, are not furnishing them proper maintenance, care or supervision, and who, being of good character and behavior, and having the potential for scholastic achievement, would benefit from the programs offered at Girard College . . . " Girard Estate, 27 Fiduc. Rep. 545 (1977).

We will, therefore, enter an order allowing the modification of the Henry G. Long will which has been sought.

## ORDER PROHIBITING DISCRIMINATION

In addition to seeking reformation of the wills, petitioner prays for an order requiring the trustees to "administer the asylum in a manner consistent with laws prohibiting the asylum from discrimination in admissions on the basis of race or sex."

For the reasons hereinafter set forth, the requested order pertaining to administering without discrimination is refused. Discrimination which has existed with regard to race and sex has as its sole root cause the specific language of the will of the testator through whose generosity the home came into existence. We do not perceive the actions of the trustees as having been mala fides. Without mala fides, it is our opinion that entitlement to an order of nondiscrimination does not exist. The request is, in our opinion, premature and, hopefully, unnecessary. The position of the trustees has been one between Scylla and Charybdis. To admit others than whites, to admit others than women, would have been contrary to the clear language of the will. We do not regard the law as requiring that the trustees make the determination without direction by the court to which they must be responsive. To refuse to admit others than whites, to refuse to admit men has been asserted to be unlawful by petitioner. But the unlawfulness thereof, if the assiduous research of petitioner be accepted, has heretofore been established in only one case per-

taining to an orphanage in the western district of Virginia. Obviously, the conclusion reached in Hughes, in a Federal court without jurisdiction in Lancaster County, would not require the same conclusion as to the home operated by the Long trustees. The evils of operating the asylum contrary to the will of Henry G. Long on the one hand or contrary to statutory or constitutional law will have been resolved upon final determination of the questions which are now before this court. We conclude that the trustees have conducted the affairs of the asylum with optimum bona fides. Their course having now been charted by the application of the doctrine of cy pres in the order which is to be entered by the court, it is incumbent upon them to administer consistently with the will of Henry G. Long, as reformed.

Even had we deemed petitioner entitled to an order as requested as to race, we, nevertheless, would deny an order as to sex based on other grounds.

The evidence establishes that the home is a three-story structure. Female guests reside in single rooms on each floor. They share bathroom facilities at the end of a hall on each floor. Obviously, the admission of women, other than whites, would in no way require a change in the existing facilities. The admission of men could be accomplished only by alterations to the building or by the gradual vacation of one floor until it contained no women guests. There is no testimony from which the extent and costs of alterations could be determined. There is no testimony as to the time during which rooms would have to remain without occupants until a floor would be empty so that male

guests could be received. Since the cost or the period of time could conceivably impair the purpose and intention of the charity, it would be impractical on the present state of the record to direct that the trustees not discriminate against males. Whether nondiscrimination against males can be accomplished without interfering with the charitable purpose is a subject which will require the attention of the trustees.

Petitioner has presented no evidence touching on the feasibility of admitting males in the building as it is presently constructed and occupied. Lacking evidence, we are unable to imagine how the result which has been sought is capable of being attained without serious impairment of the charity.

Although we have concluded that application of the doctrine of cy pres is appropriate, we, nevertheless, have determined that the order to be entered simultaneously herewith shall be limited solely to reformation of the will of Henry G. Long.

The method and manner of compliance with the will after reformation, the policies to be adopted and procedures to be taken in implementation thereof are for resolution and determination by the trustees. Intervention by the court would be appropriate only upon their failure. The law imposes the responsibility to attain fulfillment of the reformed will on the trustees. It is fair and just that they have the opportunity to exercise their judgment and discretion unhampered by court-ordered compulsion.

Although the conclusion which has been reached by the court results in changing the will of Henry G. Long, it seems appropriate to note that in fact the will had heretofore been subjected to a change. The earlier change was effected at the instance of the

trustees; the present change is effected at the instance of the Attorney General of the Commonwealth in fulfillment of the duties imposed on him.

## ORDER

And now, January 5, 1978, for the reasons set forth in an opinion filed herewith, it is ordered that:

1. The part of the will of Henry G. Long which provides "for establishing of a single woman's asylum, in the City of Lancaster, in which respectable white women, from the City and County of Lancaster and [sic] indigent circumstances, above the age of 45 years, being widows and single women, shall be admitted and maintained" is reformed as follows: "for establishing a single person's asylum, in the City of Lancaster, in which respectable persons, from the City and County of Lancaster and [sic] indigent circumstances, above the age of 45 years, being without a spouse shall be admitted and maintained."

2. The sentence of the will of Henry G. Long which states: "The women are to be admitted by the acts of a majority of the Board of Trustees, and may be removed in the same way," is reformed as follows: "The persons are to be admitted by the acts of a majority of the Board of Trustees, and may be removed in the same way."

3. Petitioner's prayer for an order to reform the will of Catharine H. Long is refused.

4. Petitioner's prayer for an order to require the

trustees of the Henry G. Long Asylum to administer the asylum in a manner consistent with laws prohibiting the asylum from discriminating in admissions on the basis of race or sex is deemed to be premature under the circumstances and is refused.

This order is entered following the filing of written memoranda of law, of supplemental memoranda of law, and after oral argument. It is, therefore, entered as a final order of the court, subject only to the rights of the parties to appellate consideration thereof, if desired.