**Joseph A. LUNINI, Jr., Plaintiff,**

v.

**Charles V. GRAYEB, individually, John Stenson, individually and in his capacity as Chief of Police for the City of Peoria, Peoria, Illinois, Stuart Barden, individually, Jeffrey Kice, individually, Defendants.**

No. 02–3028.

United States District Court,
C.D. Illinois,
Springfield Division.

Feb. 27, 2004.

Edward A. Voci, Law Office of Edward Voci, Oak Park, IL, Eric James Homa, Peoria, IL, for Plaintiff.

Kenneth E. Davies, Leiter Group, Clifton J. Mitchell, L. Lee Smith, Stephen M. Morris, Hinshaw & Culbertson, Gerald W. Brady, Jr., Brady & Flanagan, Peoria, IL, for Defendants.

## ORDER

SCOTT, District Judge.

This matter comes before the Court on Defendant Charles V. Grayeb's Motion for Summary Judgment (d/e 144) and on Defendants John Stenson, Stuart Barden and Jeffrey Kice's (collectively City Defendants) Motion for Summary Judgment (d/e 143). For the reasons stated below, Defendant Grayeb's Motion for Summary Judgment is allowed in part and denied in part, and the City Defendants' Motion for Summary Judgment is allowed in part and denied in part.

## FACTS

Defendant Charles Grayeb is a member of the Peoria City Council. Defendant John Stenson is the Police Chief for the Peoria Police Department. Defendants Stuart Barden and Jeffrey Kice are police officers with the Peoria Police Department.

Defendant Grayeb and Plaintiff Joseph A. Lunini, Jr. met in June 1995.[1] Lunini

---

1. Unless the citation indicates otherwise, the facts are those stated in the Statement of Undisputed Facts' portion of the City Defendants' Motion for Summary Judgment (d/e 143), which are undisputed by Lunini.

and Grayeb began a personal, sexual relationship in June of 1995, and terminated it sometime in the first half of 2000. In December 1995 or January 1996, Lunini and Grayeb began to reside together at 502 Northeast Monroe Street, Peoria, Illinois. In 1996, Lunini and Grayeb purchased apartments located at 504–504 ½ Northeast Monroe Street, Peoria, Illinois ("Monroe Street Apartments"). They purchased the property as a business venture. *Grayeb Memorandum in Support of Motion for Summary Judgment (Grayeb)*, (d/e 145) p. 3, ¶ 2.

In 1997, Lunini and Grayeb moved into the residence at 510 West High Street (High Street Residence), Peoria, Illinois. Grayeb purchased the West High Street property in August 1997; he is the sole record owner of the property. There are eight rooms on the first floor of the High Street Residence, seven rooms on the second floor, and five rooms on the third floor. There is only one kitchen. Grayeb currently lives throughout the entire residence. The residence is a single family home. *Lunini Response to City Defendants' Motion for Summary Judgment (Lunini)* (d/e 153) p. 29, ¶ 105. Lunini also resided at the High Street Residence from 1997 until 2000. From 1997 until June 2000, Lunini's children would visit the High Street Residence almost every weekend. The only persons who lived at the High Street Residence during that time period were Lunini and Grayeb.

Apparently sometime during the first half of the year 2000, Lunini and Grayeb began to have major difficulties in their relationship. On June 27, 2000, after a Council meeting, Grayeb met with Stenson and discussed problems with Lunini. This meeting occurred in the City Hall parking lot, although it might have begun in City Hall itself. *Lunini*, p. 22, ¶¶ 58, 59. De-

fendants characterize this meeting as an informal conversation. *City Defendants' Reply*, p. 5, ¶¶ 54, 55. According to Grayeb, he told Stenson that Lunini was threatening to produce the media on Grayeb's front yard unless Grayeb acceded to Lunini's demands that Grayeb pay him $25,000, grant Lunini a five year service agreement on all properties that Grayeb owned, and give Lunini the property at 510 West High Street.[2] *Grayeb Dep.*, p. 83. In addition to these extortion and blackmail threats, Grayeb told Stenson that Lunini had not paid the rent for two months. *Id.*, p. 138. According to Grayeb, Stenson told Grayeb that Grayeb should bring this matter to the attention of the State's Attorney's office for possible blackmail and extortion charges. *Id.*, p. 87.

According to Stenson, during this June 27, 2000 conversation, Grayeb told him that he had a houseguest and wanted to know the procedures for removing him from the house. *Stenson Dep.*, p. 74. Grayeb does not recall referring to Lunini as a "houseguest." *Grayeb Dep.*, p. 138. Stenson told Grayeb that if Lunini was a houseguest, and not paying any rent, then all Grayeb needed to do was to ask Lunini to leave. *Stenson Dep.*, p. 74. If Lunini did not leave, he would be criminally trespassing. *Id.*, p. 74. Stenson told Grayeb that if he wanted further legal opinion, he could contact the State's Attorney. *Id.*, p. 76. According to Stenson, Grayeb never discussed being extorted or blackmailed by Lunini. *Id.*, p. 78.

According to Lunini, when Grayeb arrived home from the City Council meeting, Grayeb told Lunini that he had spoken with a high ranking police official, and the official told Grayeb to do whatever it took to get Lunini out and not worry about a thing. *Lunini*, p. 21, ¶ 54, *citing Lunini*

---

**2.** The service agreement was presumably for    maintenance and construction work.

*Dep.*, p. 199. On the next day, June 28, 2000, Grayeb again told Lunini that the police were ready to honor Grayeb's wishes. *Id.* p. 22, ¶ 55, *citing Lunini Dep.*, p. 200. Grayeb disputes these facts, claiming that there is no support for them other than Lunini's own testimony.

On June 30, 2000, Lunini went to the High Street Residence at approximately 4:00 a.m., entering the house through the garage. Lunini went to the basement of the residence to retrieve a couple of boxes. He started to pack crystal that he owned because he was preparing to move from the residence. After Lunini finished packing the boxes, he left them in the front parlor.

Grayeb then came downstairs. Lunini claims that Grayeb was very angry; Grayeb started swearing at Lunini and got into Lunini's face, after which Lunini told Grayeb to back off. *Lunini*, p. 16, ¶ 1. Lunini claims that Grayeb told Lunini to go ahead and call the police, because they would not do anything to Grayeb because he is a councilman. *Id.*, ¶ 2. Grayeb slapped Lunini twice in the face and punched him there once. *Id.*, ¶ 3. Grayeb disputes the fact that this altercation occurred. *Grayeb Reply*, pp. 2–3. The City Defendants claim that the precise circumstances of the confrontation, except those facts which were known or could accurately be determined by the City Defendants, are immaterial to the City Defendants' Motion. *City Defendants' Reply*, pp. 7–8. Lunini then grabbed a portable telephone,

dialed 911, and went outside the house. He told the 911 operator that he had been assaulted or battered, and the assault occurred at the High Street Residence.

Defendant Barden received a radio call dispatching him to the High Street Residence. At approximately 5:00–5:30 a.m., Defendant Kice was also dispatched to the High Street Residence. Before arriving, Barden and Kice stopped their patrol cars next to each other to discuss the fact that they were going to the house where Councilman Grayeb lived. *Lunini*, p. 17, ¶ 8. When he arrived, Barden parked his squad car in the street, directly in front of the High Street Residence. The officers arrived at about 6:00 a.m., but it was light outside. *Id.*, ¶ 11.

Grayeb saw the police cars pulling up to the house, and he called the police station and spoke with a dispatcher. *Grayeb Dep.*, p. 118–20. Grayeb asked to have Stenson paged. *Grayeb Dep.*, p. 120. When he spoke with the dispatcher, Grayeb thinks he used the name "Chuck Grayeb;" he does not think that he said that he was a council person. *Grayeb Dep.*, p. 120. He testified that he called Stenson because he found it strange Lunini had entered his house at 4:30 a.m., and he did not know why the police were coming to his house at that time in the morning. *Grayeb Dep.*, p. 119. After Grayeb's call, the dispatcher phoned Stenson at his home, awakening Stenson.[3] *Stenson Dep.* p. 42. The dispatcher told Stenson that she had received a call from a council person, that the police

---

3. Lunini's Statement of Additional Facts states that the dispatcher called Stenson at 4:30 a.m. *Lunini*, p. 23, ¶ 67, *citing Stenson Dep.*, p. 42. The City Defendants state that this fact is undisputed. However, Stenson did not testify as to the exact time he received the phone call. *Stenson Dep.*, p. 42. He only testified that the phone call awakened him. *Id.* Further, it is undisputed that Grayeb called the dispatcher at 6:00 a.m., and asked

for Stenson to call him. *City Defendants' Motion for Summary Judgment*, (d/e 143), p. 7, ¶ 49. Thus, it is unclear if the dispatcher called Stenson at 4:30 a.m.; and there is no support in the record for a call occurring at that time. In his answer to the Complaint, Stenson denied ever testifying under oath that he was called at 4:30 a.m. *Stenson Answer*, (d/e 70), ¶ 24.

were at the council person's house on a domestic call, and the council person wanted to speak with Stenson. *Stenson Dep.*, p. 42. She told Stenson the council person was Grayeb, and she gave him Grayeb's phone number. *Stenson Dep.*, p. 44.

Meanwhile, outside the house, Barden exited his car and spoke to Lunini. Lunini told him that he and Grayeb had gotten into an argument about Lunini's smoking in the house. Both Barden and Kice were uniformed and had pistols on their hips. *Lunini*, p 17, ¶ 9. Lunini was in his bathrobe and was holding a telephone. *Id.*, ¶ 10. Lunini also claims that he was "visibly shaken." *Id.* p. 28, ¶ 92, *citing Kice Dep.*, p. 21. Lunini told Barden that when he was packing boxes, Grayeb had slapped him twice and punched him in the face. Lunini said he and Grayeb were ending a relationship and Lunini was intending to move. Lunini claims that when he made the comment about having a relationship with Grayeb, the officers laughed and made facial expressions. *Lunini*, p. 29, ¶ 100. Lunini told Barden that he would be leaving in a month or two. *Lunini Dep.*, p. 223. Lunini told Barden that Lunini was the owner of the house. *Lunini*, p. 18, ¶ 21.

Barden observed that Lunini was bleeding from his lip and had blood on his hand.[4] His police report indicated a cut inside Lunini's lip. *Lunini*, p. 17, ¶ 14. When Kice asked Lunini if he needed an ambulance, Lunini said he did not. *Lunini Dep.*, p. 232. Kice told Lunini that he "should go over and sit on the curb and don't leave." *Lunini Dep.*, p. 229. He felt threatened because Kice and Barden occasionally touched their guns, and there were many policemen there who talked down to Lunini. *Lunini Dep.* p. 423–24. Lunini phoned his friend Terry Ricci to

come over since Officer Barden had been aggressive toward him. Lunini thought he might need someone there to assist him. *Lunini Dep.*, 230–31. It appears Lunini also phoned Mike Gianessi. After speaking to Lunini, Barden and Kice entered the residence. Lunini remained seated on the curb for about an hour. *Lunini Dep.*, p. 229.

Sometime during this incident, Barden and Kice called for a Sergeant to come to the High Street Residence because the incident involved a councilman, a man of "prestige." *Lunini*, p. 20, ¶ 41. The Sergeant remained there until Barden and Kice left the scene. *Id.*

Upon entering the residence, Barden saw boxes with items in them, which led him to believe someone was packing, and he observed items which would indicate Lunini was moving out. Grayeb told Barden that Lunini was in the process of moving out, and they had gotten into an argument about a cigarette Lunini left in the house. *Barden Dep.*, p. 30. When Barden asked Grayeb if he knew that Lunini was injured, Grayeb responded that he did not. Grayeb did not mention a specific date when Lunini was going to move out. *Lunini*, p. 18, ¶ 26. Barden made a brief visual inspection of Grayeb, and looked at his hands. Barden observed no blood on Grayeb's face. Grayeb did not tell Barden or Stenson that Lunini was to be out of the High Street Residence by June 30, 2000. *Lunini*, p. 30, ¶¶ 111,114. While Barden was inside the house, the telephone rang. Grayeb answered it and spoke with Stenson, who apparently was returning Grayeb's earlier call. *Barden Dep.*, p. 30–31.

Both Stenson and Grayeb testified that their conversation was very short. *Grayeb Dep.*, p. 130, *Stenson Dep.*, p. 46. Accord-

---

4. Lunini claims he suffered a black eye that morning. *Lunini*, p. 28, ¶ 95, *citing Barden*

*Dep.*, pp. 82–83. However, Barden did not state that Lunini had a black eye.

ing to Grayeb, he asked Stenson if Stenson had followed up with the State's Attorney regarding Grayeb's complaint about extortion. *Grayeb Dep.*, pp. 121, 123. Grayeb thought it was possible that the police were at his home because Stenson had reported Lunini's threats of extortion to the State's Attorney, and the police were there to arrest Lunini. *Grayeb Dep.*, p. 130. According to Stenson, during this brief conversation with Grayeb, Grayeb only told him that his "houseguest" had come there earlier in the morning and that the police were currently at the house. *Stenson Dep.*, p. 47. Stenson testified that Grayeb never mentioned blackmail or extortion in relation to his houseguest, and if he had done so, Stenson would have communicated it to his officers. *Stenson Dep.*, p. 78.

At the end of their brief conversation, Stenson told Grayeb he wanted to speak with Barden, and Grayeb handed Barden the phone. According to Grayeb, Stenson and Grayeb did not speak on the phone after that.[5] *Grayeb Dep.*, p. 130. Barden told Stenson that Lunini claimed Grayeb had hit him and that Grayeb denied hitting Lunini. Barden also told Stenson that Lunini was moving out. Stenson asked Barden if there was any evidence of violence such as broken furniture, torn clothes, broken glass, or evidence of hand injuries. Barden said there was no physical evidence of any altercation, such as overturned furniture, broken glass, or torn clothes. *Stenson Dep.*, p. 55. Stenson told Barden about his June 27, 2000, conversation with Grayeb, but Stenson did not

ask Barden if the individual involved was Lunini. *Lunini*, p. 23, ¶ 71.

Stenson asked Barden if he could determine how Lunini had been injured and Barden said that he could not. *Stenson Dep.*, p. 109. Barden could not determine how Lunini was bloodied because there were no witnesses. *Barden Dep.*, p. 39. Barden testified that he did not disbelieve Lunini, but the only evidence was Lunini's word against Grayeb's. *Barden Dep.*, p. 39. From what Barden told Stenson, Stenson could not determine whether a crime had been committed. *Stenson Dep.*, p. 57. Stenson advised Barden that if there was no preponderance of the evidence to make an arrest, then he should get both parties' account of what happened and make a police report. *Stenson Dep.*, p. 94.[6]

Stenson told Barden to have Lunini leave his gate or garage opener, and to escort Lunini off the property. *Barden Dep.*, p. 38. Stenson instructed Barden that Lunini was to leave the residence and not return unless escorted by the police. After he was finished talking with Stenson, Barden handed the phone back to Grayeb, but Barden does not recall if Grayeb and Stenson had further conversation. *Barden Dep.*, p. 39.

Once Barden received Stenson's instructions, he considered his investigation over because he was going to follow Stenson's orders. *Lunini*, p. 24, ¶ 75. In Barden's 14 years as a police officer, he had never received a phone call at a crime scene from the Chief of Police, and he thought Sten-

---

5. Barden testified that sometime during his conversation with Stenson, he handed the phone back to Grayeb, and Grayeb and Stenson had another brief conversation. *Barden Dep.*, p. 36. Barden heard Grayeb call Stenson "John." *Barden Dep.*, p. 37. Grayeb then handed the phone back to Barden. *Barden Dep.*, p. 37.

6. Lunini disputes these facts, and claims that Barden and Kice observed Lunini's bleeding mouth and blood on his hand, and Lunini said Grayeb had hit him. *Lunini*, p. 13, ¶¶ 57–59. Stenson never asked if anyone had blood on his face. *Lunini*, p. 23, ¶ 72.

son's call was unusual. *Lunini,* p. 29, ¶ 99. In Kice's 21 years as a police officer, he had never received a phone call at a crime scene from a Chief of Police. *Lunini,* p. 29, ¶ 98. Barden's initial police report did not mention the conversation with Stenson, and he only added it in a supplemental report after being ordered to do so by Shift Lieutenant Jerry Vogel. *Lunini,* p. 24, ¶ 80. Lunini did not overhear any conversation Grayeb or Barden had with Stenson. Lunini never spoke with Stenson on the morning of June 30, 2000.

Barden relayed to Kice his instructions from Stenson. Kice told Lunini to remove his garage door opener, gate opener, house key, and other keys. He told Lunini he would be allowed to change into street clothes, and thereafter was to leave the property or otherwise be arrested. Lunini asked Kice why he had to leave and why Grayeb was not being arrested. *Lunini,* p. 20, ¶ 38. He told Kice that he lived in the High Street Residence. *Lunini,* p. 18, ¶ 24.

According to Lunini, Kice then grabbed the back of Lunini's robe behind his right arm and escorted him into the house. *Lunini,* p. 21, ¶ 46, *citing Lunini Dep.,* p. 238. At least three policemen were present at that time. *Id.* p. 21, ¶ 43. Barden then grabbed Lunini's arm, walked him up the stairs, took him to a bedroom, and stood in the bedroom while Lunini changed his clothes. *Lunini,* p. 21, ¶ 46, *citing Lunini Dep.,* p. 238. Defendants dispute the allegation that Barden went upstairs with Lunini, and cite Barden's testimony that he did not go upstairs. *City Defendants' Reply,* (d/e 157), p. 4, ¶ 46, *citing Barden Dep.,* p. 52, 63.[7] Lunini claims that Barden would not allow him to take

any medication or any other items with him. *Lunini Dep.,* p. 240. Defendants dispute this, again citing the portion of Barden's testimony in which he states he did not go upstairs with Lunini. *City Defendants' Reply,* p. 4, ¶ 47, *citing Barden Dep.,* p. 52.

After Lunini had changed and went downstairs, Kice escorted Lunini down the driveway and into the garage. Lunini gave Kice the garage door opener, gate opener, and house key. At the time, Lunini had a Cadillac and a Jeep at the residence, and Kice told him he could take the Jeep. Barden went outside and gave Lunini a domestic violence form and explained to him how to obtain an order of protection. Barden went back inside, gave a domestic violence form to Grayeb, and then left the residence.

After getting the keys from Lunini, Kice got into his squad car and informed dispatch that he was back in service. As Lunini left the premises in his Jeep, he proceeded south on High Street, and was followed by two squad cars. *Lunini,* p. 21, ¶ 53 and *Gianessi Dep.,* p. 100–01. A third squad car remained at the house. *Gianessi Dep.,* p. 100. Lunini felt that he was placed under arrest by Kice and Barden that morning. *Lunini Dep.,* p. 375, 379. After leaving the High Street Residence, Lunini went to the home of his friend Terry Ricci, at 2007 North Linn, in Peoria. Grayeb had never filed an eviction action in Court against Lunini. *Lunini,* p. 30, ¶ 112.

Later that day, June 30, 2000, Lunini went to the Peoria County Courthouse and filed a Petition for Order of Protection. *Grayeb,* p. 5, ¶ 20. Lunini sought exclusive possession of the High Street Resi-

---

7. However, the City Defendants do state as an undisputed fact that, "After changing his clothes, Lunini and Barden walked back downstairs." *City Defendants Motion for Summary Judgment,* p. 10, ¶ 86 *citing Lunini Dep.,* p. 241. This appears to be an admission by the City Defendants that Barden, did go, at the very least, upstairs with Lunini.

dence. *Id.*, ¶ 21. At 10:50 a.m., the court issued an ex-parte Emergency Order of Protection in favor of Lunini against Grayeb. *Id.*, p. 6, ¶ 22, *Grayeb Ex. 2*. The order prohibited Grayeb from interfering with Lunini's personal liberty and from physically abusing, stalking or harassing Lunini. The order required Grayeb to stay away from Lunini. The order of protection allowed Lunini access to the High Street Residence, only in the presence of Michael Gianessi, in order to remove items of clothing and other personal effects. *Id.*, ¶ 23. The order indicated that the court reserved ruling on Lunini's request for exclusive possession of the property. That order remained in effect until July 14, 2000. *Id.*, ¶ 24.

Grayeb also sought and received an order of protection, which was entered at 1:40 p.m. June 30, 2000. *Grayeb Ex. 6*. That order prohibited Lunini from interfering with Grayeb's personal liberty, or physically abusing, harassing or stalking Grayeb. The order granted Grayeb exclusive possession of 510 West High Street, and Lunini was ordered not to enter the house. Lunini was allowed access to the residence only in the presence of the police and Michael Gianessi, for the purpose of removing personal items. Lunini was ordered to stay away from Grayeb.

On July 14, 2000, Lunini and Grayeb, by agreement, sought and obtained Interim Orders of Protection. *Grayeb*, p. 6, ¶ 25. By these agreed orders, Lunini was barred from entering or remaining on the property except in the presence of Gianessi and the police, and for the purpose of removing personal possessions. *Id.*, ¶ 26, *Grayeb Exs. 3 and 7*. This order was in effect until July 28, 2000, on which date an evidentiary hearing was held, and Lunini and Grayeb sought Plenary Orders of Protection. *Id.* ¶¶ 27, 28. Following the hearing, Lunini and Grayeb agreed to the entry of plenary

orders of protection which were to remain in effect for two years, and granted Grayeb exclusive possession of the property. *Id.*, ¶¶ 30–32, *Grayeb Exs. 4 and 8*. Those agreed orders allowed Lunini access to 510 High Street only at 9:30 a.m. on July 31, 2000, and in the presence of police, with no more than four movers. *See July 28, 2000, Order of Protection*, Grayeb Ex. 8.

Shortly after June 30, 2000, when Lunini pursued criminal charges against Grayeb, Assistant State's Attorney Steve Patelli told Lunini that they would be unable to take the case to a jury because it was a "homo thing" and man against man. *Lunini*, pp. 13–14, ¶ 78. He said it would be a lot different if Lunini were a woman. *Id.*

Peoria Police Department General Order # 400.01 sets forth procedures for responding to domestic violence incidents. *See General Order # 400.01*, Lunini Ex. O. The Order provides that under the Illinois Domestic Violence Act, an officer is expected to handle domestic violence in a manner similar to any other crime. *Id.* In a domestic violence situation, an officer shall make an arrest when probable cause exists that a felony has been committed, or that a misdemeanor/felony has been committed and the victim has visible signs of injury. *Id.* Under Section D of General Order # 400.01, one of the circumstances when an arrest is not made is if an officer is unable to determine if a crime has been committed. All sections of General Order # 400.01 must be read collectively. On the morning of June 30, 2000, Barden assumed Lunini had been injured but he was not sure how. *Barden Dep.*, p. 4. Lunini disputes this fact, and claims that Barden knew how Lunini was injured.

As a police officer, Barden has responded to a scene where a person was bleeding or visibly injured, and that person accused someone else of causing the injury. Barden has arrested both males and females

based upon the appearance that someone has suffered an injury and the injured person has accused another of striking him or her. Barden has arrested more men than women in domestic violence situations, and the breakdown of male arrests to female arrests is 70 percent to 30 percent. Barden has also responded to domestic violence calls in which he did not make an arrest, even though he observed a physical injury, and the injured person stated someone else had hit him. Factors to consider when making an arrest include the presence of weapons at the scene, overturned furniture, and another witness at the scene telling the officer someone struck the victim.

## LUNINI'S THIRD AMENDED COMPLAINT

On July 12, 2002, Lunini filed his Third Amended Complaint (d/e 87). Counts I–IV are brought pursuant to 42 U.S.C. § 1983. Count I alleges that all Defendants violated Lunini's Fourth Amendment Right to be free from unreasonable seizure. Count II claims that all Defendants deprived Lunini of equal protection of the laws, and impeded the course of justice in violation of the Fourteenth Amendment. Count III alleges that all Defendants conspired to deprive Lunini of his rights under the Fourth Amendment and the Equal Protection Clause. Count IV claims Grayeb denied Lunini his substantive due process right to familial relations, because Lunini was forced to live in a friend's basement for forty to fifty days and unable to exercise his right to the care, custody, and management of his children.

Count V alleges that Grayeb violated the Fair Housing Act, 42 U.S.C. § 3604, by extracting sexual favors from Lunini as a condition of Lunini's becoming or remaining in possession of the dwellings at 510–512 High Street, and the Monroe Street Apartments. Count VI alleges Grayeb violated the Fair Housing Act by engaging in sexual harassment housing discrimination, in that he created a hostile and offensive environment in a sexually harassing manner at the High Street Residence and Monroe Street Apartments. Count VII alleges that Grayeb violated the Fair Housing Act by acting with the intention of extracting sexual favors from Lunini as a condition of Lunini's becoming or remaining an owner, possessor or other interest holder of the High Street Residence and the Monroe Street Apartments. Count VIII alleges all Defendants violated the Fair Housing Act by engaging in sex based housing discrimination. Count IX alleges a state law claim of assault and battery against Grayeb.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be entered if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R.Civ.P.* 56(c). At summary judgment, Defendants must present evidence which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must consider the evidence presented in the light most favorable to Lunini. Any doubt as to the existence of a triable issue of fact must be resolved against Defendants. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once Defendants have produced evidence showing that they are entitled to summary judgment, Lunini must present evidence to show that issues of fact remain. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 576, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## ANALYSIS

### I. Count I: Fourth Amendment Claim

Lunini claims that the events that occurred at the High Street Residence on the morning of June 30, 2000, constituted an unreasonable seizure, in violation of the Fourth Amendment. Defendants raise the defense of qualified immunity. In determining whether Defendants are shielded by qualified immunity, the Court must first determine whether Lunini's has established a constitutional violation, i.e. whether he was "seized" and whether that seizure was "unreasonable." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *White v. City of Markham*, 310 F.3d 989, 993 (7th Cir. 2002). If the Court finds that a constitutional violation occurred, only then will it determine whether the right violated was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

#### A. Seizure of Lunini

An individual's property is "seized" for Fourth Amendment purposes "when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook County, Illinois*, 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) *quoting United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). " 'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home.'" *Id.* (citations omitted). During an encounter with the police, the test to determine if an individual is seized is whether a reasonable person, standing in the individual's place, would feel free to decline the officer's requests or otherwise terminate the encounter. *White*, 310 F.3d

at 993–94, *citing United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) and *Florida v. Bostick*, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

Defendants have cited to *White*, which in many respects contains facts similar to the case at bar. Plaintiff White and his son lived in a house owned by White's aunt, without a signed lease. White and his aunt had an oral understanding that White would live rent-free, provided that he cared for the place and paid some of the bills. *White*, 310 F.3d at 991. White's aunt did not live in the house. *Id.* White and his aunt agreed that White and his son would move out after April 1, 1999, which was when his aunt would begin remodeling the home. *Id.* On March 8, 1999, the aunt went to the home and told White that he and his son were no longer welcome. There was a verbal altercation, and the aunt started throwing White's belongings throughout the house, including lamps and a fish tank, which shattered. *Id.* at 991–92.

White called the police. When the police officer arrived, the parties were still arguing, and each asked the officer to remove the other from the premises. *Id.* at 992. The officer eventually determined that the aunt was the owner of the property. The officer placed his hand on White's shoulder and told him that if he did not leave the property immediately, he would be arrested. *Id.* White stated he did not want to leave, and the officer repeated his threat; at the same time the aunt began throwing White's possessions out of the house. *Id.* White and his son eventually took their belongings and left the house. *Id.* The Court did not decide whether White was seized, but instead found that even if he was in fact "seized," that seizure was reasonable.

It is undisputed that Officer Kice told Lunini that Lunini would be allowed to change into his street clothes, and then he would have to leave the property or face arrest if he did not comply. Lunini claims that Kice grabbed him by the back of the arm and escorted him into the house, and then Officer Barden walked him upstairs and stood in the bedroom while Lunini changed. Thereafter, Kice escorted Lunini to his Jeep, and Lunini surrendered the garage door opener, gate opener and house key. Lunini then left the property.

These facts, when viewed in the light most favorable to Lunini, show that he was compelled to follow the police officers' commands or face arrest. Not only was Lunini ordered to leave the premises under threat of arrest, but he was also directed to surrender the house key, gate opener and garage opener. Such actions deprived Lunini of his access to the residence. *Soldal,* 506 U.S. at 61, 113 S.Ct. 538. There is a dispute as to whether Lunini actually had a possessory interest in the residence. However, it is undisputed that Lunini had lived in the house for approximately two years. Lunini was living in the High Street Residence, and Grayeb had never filed an eviction action in court against Lunini. Thus the Court finds that Lunini has demonstrated the existence of at least a genuine issue of material fact that he was seized by being deprived of his access to the property.[8]

### B. *Unreasonableness of the Seizure*

■ Determining whether a seizure is "reasonable" requires one to balance an individual's privacy interests against legitimate government interests in view of the totality of the circumstances. *White,* 310

F.3d at 995. In *White,* the Court noted that White's claim to a right to remain on the property was tenuous at best, since no written lease existed, and he did not pay rent. *Id.* at 996. The police officer arrived in the midst of an altercation between White and his aunt, and in order to restore peace, the officer:

> was forced to ask either [the aunt], the admitted nonresident homeowner, or White, her relative and resident guest, to leave the premises. Based on this unique situation, it could not have been unreasonable for [the officer] to request White, the family member with the apparently inferior property interest in remaining on the premises, to vacate the explosive situation. Afterwards, when all of the facts were clear, it may have been that [the officer] was incorrect in his conclusion, but a police officer cannot be expected to make that determination when lamps are flying and family members are shouting at each other. Nor was it unreasonable to use the threat of arrest to accomplish this goal.... In fact, based on White's own contention that 'a citizen who is forced out of his home has his liberty restrained,' [the officer] could have been violating [the aunt's] Fourth Amendment rights if he had asked her to leave her own house or face the possibility of arrest.

*Id.*

■ In this case, when Officers Kice and Barden arrived at the scene, Lunini, who had a bloody lip and was standing outside in his bathrobe, told them Grayeb had hit him. He also told them that he lived in the house and that he was an owner of the house, but he was moving out in a month or two, and was packing boxes

---

8. This Court has previously ruled in this case that, "there existed clearly established law at the time of this incident that a seizure occurs in the eviction context, and such action must comport with Fourth Amendment protections." *March 13, 2002, Order,* (d/e 34), pp. 11–12.

that morning. The officers ordered Lunini to wait outside while they went in the house to further investigate. Ordering Lunini to remain outside was not unreasonable since it appeared there had been a fight, and separating the parties was reasonable as part of the officers' duty of keeping the peace. *See White,* 310 F.3d. at 996.

When Barden went into the house, he observed boxes which indicated to him that Lunini was in fact moving out. He saw no broken furniture, broken glass or hand injuries to Grayeb. After Barden relayed this information to Chief Stenson and received instructions, he and Kice ordered Lunini to change clothes, leave the property, and surrender his keys and gate and garage door openers.

In the context of these facts, it was not unreasonable for the police to order Lunini to leave the property and not come back unless accompanied by the police. They encountered two parties who appeared to be in a confrontation, and one had a bloody lip. While the police did not arrest Grayeb, there was evidence of a dispute, which, for all the police knew, might erupt again once they left the scene. Therefore, separating the parties was not unreasonable. Even though Lunini claimed that he also owned the house, the parties clearly needed to be separated. Since Lunini had said he was moving out in the near future, ordering Lunini to leave the property was not unreasonable. *See White,* at 996.

Lunini claims that probable cause existed to arrest Grayeb because Lunini was bleeding, and he told the officers that Grayeb had hit him. Because the police had probable cause to arrest Grayeb, but did not do so, Lunini argues they violated General Order # 400.01. When the facts are viewed in a light most favorable to Lunini, the police had probable cause to arrest Grayeb. However, simply because

the police could have arrested Grayeb does not make the decision to remove Lunini unreasonable. The police needed to separate the parties; it was clear that each of them had been living at the house. Since Lunini had told the police he was packing boxes, at the time of the altercation, and intending to move from the premises, it was logical for the police to remove Lunini. Even if the police had arrested Grayeb for battery, there would still have been a need for the police to direct one of them to leave the premises to keep the altercation from rekindling when Grayeb returned. An arrest of Grayeb would likely have resulted in his removal from the premises for only an hour or two, since bail for misdemeanors in Illinois is set by Illinois Supreme Court rule at $1000, with a 10% deposit required. *See Illinois Supreme Court Rules* 528(c), 530; 725 ILCS 195/1. An arrest of Grayeb would not have eliminated the need to separate the two, and the police action taken in directing Lunini to leave was not unreasonable since he had told them he was moving anyway.

It is true that the police directive to leave initially deprived Lunini of any possessory interest in the residence. However, four or five hours later, the Peoria County Court's Order of Protection prohibited Lunini from entering the High Street Residence, except in Gianessi's presence, for the purpose of retrieving personal effects. Once the order of protection was entered, Lunini's restriction on entering that property was per the terms of that order. Thus, Lunini's removal from the property solely on the basis of the City Defendants' command was only for four or five hours' duration. This is not an unreasonable amount of time to separate parties to a domestic dispute.

Further, two weeks after the incident, Lunini agreed to a protective order that limited Lunini's access to the High Street

Residence under terms similar to those set by the police in the early morning hours of June 30, 2000. In other words, Lunini ultimately agreed to the restrictions set by the police on that morning. In addition, when the police were summoned that morning, they did not have time to reflect on the ownership issues of the house or have access to the County Recorder of Deeds' records. Instead, their objective was to separate the parties to an alleged domestic dispute. When these factors are viewed as a whole, and in the light most favorable to Lunini, the Court finds that the seizure of Lunini on the morning of June 30, 2000, was not unreasonable, and Lunini's Fourth Amendment claim fails as a matter of law as to all Defendants. The Court has no need to address the issue of whether Defendants are protected from qualified immunity, since they did not violate Lunini's Fourth Amendment right to be free from unreasonable seizure.

## II. Count II: Equal Protection Claim

■ Section 1983 allows an individual a private cause of action if his constitutional rights are violated "under color of any statute, ordinance regulation, custom, or usage, of any State." 42 U.S.C. § 1983. One way Lunini can state a claim for denial of equal protection is to show that he was discriminated against because of his membership in a particular class. See Schroeder v. Hamilton School Dist., 282 F.3d 946 (7th Cir.2002). Another way for Lunini to state a claim for denial of equal protection is to show that the action Defendants took against Lunini "was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." Esmail v. Macrane, 53 F.3d 176, 180 (7th Cir.1995).

### A. Acting Under Color of State Law

■ For § 1983 purposes, there is no dispute that Chief Stenson, and Officers Barden and Kice acted under color of state law. However, Grayeb claims that he was not acting under color of state law during the events at issue, and therefore, Lunini cannot state a § 1983 claim against him. An action is taken under color of state law "when it is 'made possible only because the wrongdoer is clothed with the authority of state law....'" Hughes v. Meyer, 880 F.2d 967, 971 (7th Cir.1989) (state game warden was not acting under color of state law when he reported an incident of false imprisonment to the police, because his duty as game warden was to enforce conservation laws, but not general criminal law such as false imprisonment). Whether an official acted under color of state law should turn on nature of specific acts the official performed, rather than the duties he was assigned to perform. Pickrel v. City of Springfield, 45 F.3d 1115,1118 (7th Cir.1995) (city police officer serving as private security guard could be considered state actor when he was wearing his police uniform, displaying his badge, and wearing his gun, all symbols of state authority).

According to Grayeb, when he spoke to Stenson after the city council meeting on July 27, 2000, he informed Stenson that Lunini was blackmailing and extorting him. Stenson recommended that Grayeb contact the State's Attorney's office, and report Lunini's crime. Stenson's version of events is that Grayeb never mentioned blackmail or extortion, but rather complained of a houseguest who had not paid rent for two months. Stenson informed Grayeb that Lunini could be considered a trespasser, and if he wanted a second opinion, Grayeb could contact the State's Attorney's office. Under either version of this story, there is no evidence that Grayeb attempted to use his influence as a city councilman to take any action against Lunini or to have others take action on behalf of Grayeb.

However, the evening after the meeting, as well as the next day, Lunini claims Grayeb told him that a high police official had said that he should do whatever it took to get Lunini out of the house, and Grayeb should not worry about a thing. During the altercation Grayeb told Lunini to go ahead and call the police because the police would not do anything to Grayeb because he was a councilman. These statements, when viewed in a light most favorable to Lunini, indicate that Grayeb may have used his position as a councilman to influence the police not to arrest him at the time of the altercation.

On the morning of the June 30, 2000 incident, it is undisputed that the police were dispatched to the High Street Residence because Lunini called 911. It is undisputed that Grayeb spoke with Stenson only briefly that morning. According to Grayeb, he asked Stenson if he had followed up with the State's Attorney, because he thought the police might be there to arrest Lunini for extortion or blackmail. According to Stenson, Grayeb said that his "houseguest" came into the house early in the morning, and the police were currently there. However, it is unlikely that the dispatcher would have phoned Stenson at home in the early morning hours upon the request of an ordinary citizen in this type of incident, and it is also unlikely Stenson would have returned the call to an ordinary citizen at that early hour. The evidence, in particular the statements attributed to Grayeb by Lunini, when viewed in the light most favorable to Lunini, demonstrate the existence of a genuine factual issue as to whether Grayeb was acting under color of state law in trying to influence the police not to arrest him.

█ In the alternative, Lunini contends that Grayeb was a private actor who conspired with state actors to achieve ends to his benefit. However, the only evidence of any conspiracy is found in the context of Grayeb's position as a councilman. Barden and Kice conferred before arriving at the scene because they were going to a councilman's home. The police chief was called at 4:30 or 6:00 a.m. and told there was a domestic dispute at a councilman's home. Stenson called officers at the scene in a type of investigation where the officers had never heard from him before. Grayeb's comments to Lunini were that the police would not do anything to him because he was a councilman. To the extent that these actions and statements give rise to an inference of conspiracy, it is one involving Grayeb in his official capacity, rather than his capacity as a private citizen. The Court, therefore, allows Defendants' Motions for Summary Judgment on the private actor conspiracy claim.

### B. *Homosexuality*

█ To state a claim that he was denied equal protection because of his homosexuality, Lunini must show: (1) Defendants treated him differently than others who were similarly situated; (2) Defendants treated him differently because Lunini is a homosexual; and (3) Defendants' discriminatory intent was not rationally related to a legitimate state interest. *Schroeder*, 282 F.3d at 950–51.

█ Lunini cannot show that the City Defendants treated him differently because he is a homosexual, nor can he show that similarly situated heterosexuals were treated more favorable than he was. Lunini claims that after he told Barden and Kice that he and Grayeb were ending a relationship, they laughed and made silly faces. *Lunini* ¶ *100, citing Lunini Dep.*, p. 396–97. Other than laughter, the officers made no verbal comments about Lunini's sexual orientation. *Lunini Dep.*, p. 396. Lunini claims that after Barden learned Lunini was a homosexual, he fed slanted

information to Chief Stenson over the phone. Barden did not tell Stenson that Lunini was not moving out for another one or two months, or that Lunini claimed to be an owner of the house. Barden did not inform Stenson that probable cause existed to arrest Grayeb, even though Lunini's mouth was bleeding, and Lunini had told Barden that Grayeb had hit him.

The fact that Barden and Kice made faces and laughed when Lunini said that he was involved with Grayeb is insufficient to show that they discriminated against Lunini because he is a homosexual. The officers' treatment of Lunini was removing him from the premises, and no evidence presented shows that the officers treated Lunini differently in that respect because he is a homosexual. The confrontation between Grayeb and Lunini dictated that the police take action to separate them. The fact that the police directed Lunini to leave does not show discrimination by the police against homosexuals because Lunini had indicated to police that he and Grayeb were both homosexuals. Lunini notes that Barden testified that in domestic violence situations, he has arrested more men than women. However, that is not evidence that Barden discriminated against Lunini because he is a homosexual, or that Barden treated heterosexuals similarly situated to Lunini more favorably.

■ Finally Lunini points out that shortly after the incident he pursued criminal charges against Grayeb, but Assistant State's Attorney Steve Patelli said he would not take the case to trial because it was a "homo thing," but that it would be different if Lunini were a woman. This statement is irrelevant to show that the City Defendants discriminated against Lunini because he is a homosexual. Patelli, as an Assistant State's Attorney is not a city employee, and there is no evidence he was involved in the events of the morning of June 30, 2000. Lunini claims that Patelli's statement is evidence of a conspiracy between Patelli and the City Defendants to discriminate against Lunini because he is a homosexual. However, there is no evidence of any agreement between Patelli and the City Defendants to discriminate against Lunini because he is a homosexual. There is nothing tying Patelli into the events of June 30, 2000, and he is not a party to this case.

## C.  Class of One

■ Lunini may state a claim for denial of equal protection, even if he is not a member of a protected class, if Defendants' actions under color of state law were undertaken due to a spiteful effort to "get" Lunini for reasons unrelated to any legitimate state objective. *Esmail*, 53 F.3d at 180. While Lunini is not required to show an "orchestrated campaign" to deprive him of equal protection, he must show that the cause of the differential treatment toward him was a totally illegitimate animus on the part of the City Defendants. *Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir.1998) *aff'd*, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). However, even if the City Defendants harbored an illegitimate animus toward Lunini, Lunini cannot prevail if the City Defendants would have acted the same way regardless of the animus, since "a tincture of ill will does not invalidate governmental action." *Id.*

■ "Selective withdrawal of police protection . . . is the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). Lunini states a class of one claim if Defendants' withdrawal of police protection from Lunini was caused by a "totally illegitimate animus toward [Lunini] by [Defendants]." *Id., quoting Olech*, 160 F.3d at 388.

■ When Grayeb allegedly assaulted Lunini on the morning of June 30, 2000, Lunini claims that Grayeb told Lunini to go ahead and call the police because it would do no good since Grayeb was a councilman. After Officers Barden and Kice were summoned, they conferred before arriving on the scene, and noted that they were going to Councilman Grayeb's house. Early in the morning, Grayeb called the police station and requested that Stenson call him. Stenson was called at home by the station operator and awakened; he then returned Grayeb's call. Stenson asked to speak with Officer Barden, but in Barden and Kice's careers as policemen, a Chief has never called them at a crime scene. Even though probable cause existed to arrest Grayeb, Stenson instructed Barden not to arrest anyone. Sometime that morning, Barden and Kice decided to call a sergeant to the scene, since the incident involved councilman Grayeb, a "person of prestige."

These facts, when viewed in the light most favorable to Lunini, and drawing all inferences in his favor, raise a genuine factual issue as to whether Grayeb attempted to use his authority as a city councilman to avoid arrest. They also create a factual issue as to whether the City Defendants failed to arrest Grayeb for battery because of his position. Although the City Defendants dispute that and note that they do not always make an arrest in such instances, their conduct here was arguably at odds with their own General Order #400.01. Further, it is unlikely that the Chief of Police would have returned a call to an ordinary citizen's home early in the morning, and the officers called a superior officer to the scene because the incident involved a person of prestige. All of these facts, when viewed in their entirety and in a light most favorable to Lunini, give rise to an inference that due to Grayeb's position as councilman, Chief Stenson, Officer

Barden and Officer Kice gave Grayeb special treatment in not arresting him, despite the existence of probable cause.

If due to his position as a councilman, Grayeb obtained favorable treatment, at the expense of Lunini, then Grayeb's attempt to seek such favorable treatment is an improper motive unrelated to any legitimate government objective. If the City Defendants declined to provide police protection to Lunini and declined to arrest Grayeb because he was a councilman, even though probable cause existed, then they demonstrated an illegitimate animus toward Lunini, the complainant, which was unrelated to legitimate police conduct. The police in that instance, would have been acting out of an improper motive—to give favored treatment to Grayeb because of his position.

When viewing the facts in the light most favorable to Lunini, and drawing all inferences in his favor, there are triable issues of fact as to whether Defendants deprived Lunini of police protection out of an illegitimate animus and improper motive toward Lunini, and for reasons unrelated to any legitimate state objective. *See Hilton,* 209 F.3d at 1007–08.

■ Defendants also raise the defense of qualified immunity to Lunini's equal protection claim. However, the Court finds that at the time of the incident, it was clearly established that action depriving a citizen of police protection at the purely personal request of a government official was unrelated to any legitimate state objective, and denied the citizen the right to equal protection of the law. A government official's exercise of his powers in order to deprive a citizen of police protection, for personal reasons, is also unrelated to any legitimate state objective. *See Olech,* 160 F.3d at 386; *Hilton,* 209 F.3d at 1005. It is fundamental that gov-

ernmental authorities are not to bring the power of the government to bear upon on ordinary citizen for purely personal reasons. Likewise, they may not afford special protection to one individual at the expense of others, solely because of that individual's position of authority. Therefore, Defendants are unable to raise the defense of qualified immunity to avoid summary judgment.

In sum, Lunini does not state an equal protection claim on the basis of unequal treatment because he is a homosexual. However, Lunini does state an equal protection claim under *Esmail*, since he shows triable issues of fact on the issue of whether the Defendants' actions on the morning of June 30, 2000, in failing to arrest Grayeb, were done solely out of an illegitimate animus toward Lunini, and were taken for reasons unrelated to any legitimate state objective. Defendants do not avoid summary judgment on this claim by asserting qualified immunity. Therefore, all Defendants' Motions for Summary Judgment are denied on Lunini's *Esmail* equal protection claim.

### III. *Count III: § 1983 Conspiracy Claim*

Lunini claims that all Defendants engaged in a conspiracy to deprive him of his constitutional rights under the Fourth Amendment and Equal Protection Clause. *See Third Amended Complaint*, p. 15, ¶ 45. Generally, a conspiracy is defined as an agreement between two or more persons to accomplish an unlawful purpose. *See United States v. Stotts*, 323 F.3d 520 (7th Cir.2003). The City Defendants' claim that "Because Plaintiff's underlying claim of illegal seizure and denial of equal protection fail for the reasons stated hereinabove, Defendants submit that it follows *a priori* that Plaintiff's conspiracy claim must likewise fail." *City Defendants Mo-*

*tion for Summary Judgment*, p. 28. This is the only argument they offer as to why they are entitled to summary judgment on the conspiracy claim. Grayeb, who has adopted the City Defendants' arguments, raises no other argument in support of his Motion for Summary Judgment as to the conspiracy claim.

█ As stated above, none of the City Defendants violated Lunini's rights under the Fourth Amendment. The rationale for removing Lunini came from Lunini; Lunini therefore cannot state a claim for conspiracy to violate his Fourth Amendment rights. However, the facts when viewed in the light most favorable to Lunini raise a factual issue as to whether each Defendant denied Lunini's right to equal protection. The facts also, when viewed in the light most favorable to Lunini, raise a genuine issue of fact as to whether on the morning of June 30, 2000, there was an agreement between the Defendants to deprive Lunini of his right to equal protection under his "class of one" theory. Therefore, there is a disputed issue of fact as to whether Defendants conspired to violate Lunini's right to equal protection under the laws.

Defendants are not entitled to qualified immunity as to this conspiracy claim for the same reasons they are not entitled to qualified immunity as to the equal protection claim. Therefore, summary judgment is not warranted on the Count III Conspiracy claim with respect to Lunini's equal protection ("class of one") rights.

### IV. *Count IV: Substantive Due Process Claim (as to Grayeb only)*

█ Lunini claims that his exclusion from the High Street Residence by Grayeb denied Lunini his substantive due process right of familial association because Lunini was rendered homeless for 45 days, which resulted in Lunini's loss of custody/visitation with his children during that period.

*Third Amended Complaint,* p. 16, ¶ 45. Lunini claims that Grayeb knew that Lunini's next prospective residence, located at 106 North Western and owned by Michael Gianessi, was uninhabitable. *Lunini,* p. 29, ¶ 106, *citing,* Lunini Dep. 196, 262. Lunini could not care for his children when he did not have a place to stay. *Lunini,* p. 28, ¶ 91.

As stated above, it was not unreasonable for the City Defendants to remove Lunini from the premises on June 30, 2000. It is undisputed that after he was barred from the property, Lunini sought an order of protection, and at 10:50 a.m. on June 30, 2000, an order of protection was entered, which denied Lunini access to the property. It is also undisputed that on the morning of June 30, 2000, Lunini's ex-wife was in physical custody of his children. *See Grayeb,* ¶¶ 18, 19. Therefore, after 10:50 a.m. on June 30, 2000, Lunini's exclusion from the High Street Residence (and any denial of visitation rights caused by that exclusion) was a result of the terms of the various protective orders, and not a result of Grayeb's actions.

Lunini claims that Grayeb threatened to throw Lunini out, and he did not care what happened to Lunini's children. He also claims that Grayeb acted jointly with the City Defendants to exclude Lunini from the property. However, this does not negate the fact that the orders of protection caused Lunini's restriction to the property, and not Grayeb's actions, except for four or five hours. There is no evidence Lunini had any scheduled visitation set during that four or five hours. Lunini does state that Grayeb made false statements to the court in order to obtain the various orders of protection. *Lunini Response to Grayeb's Motion for Summary Judgment,* p. 29–30. However, Lunini points to no evidence of Grayeb making false statements to the court. Further, the first ex-parte

Order of Protection entered on June 30, 2000, was a result of Lunini's petition. Lunini and Grayeb agreed to the entry of the July 14, 2000, Interim Order of Protection and the July 28, 2000, Plenary Order of Protection. Lunini cannot show that Grayeb caused Lunini to be deprived of the exercise of his family visitation rights.

## V. Counts V–VIII: Fair Housing Act Claims

The Fair Housing Act (FHA) makes it unlawful to refuse to sell, rent or otherwise make unavailable a dwelling to any individual because of race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(a). The FHA also prohibits discriminating against any person in the terms, conditions, or privileges of sale or rental of a dwelling because of race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(b). The prohibitions in § 3604 do not apply to "rooms or units in dwellings containing living quarters occupied or intended to be occupied by no more than four families living independently of each other, if the owner actually maintains and occupies one of such living quarters as his residence." 42 U.S.C. § 3603(b)(2). Dwelling is defined by the FHA as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families . . . ." 42 U.S.C. § 3602(b).

### A. High Street Residence

■ All Defendants assert that Lunini's fair housing claim fails because the High Street residence falls within the § 3603(b)(2) exemption. It is undisputed that during the entire time Lunini lived in the High Street Residence, the residence was a single family home. The house consisted of rooms in a dwelling containing living quarters occupied fewer than four

families living independently of each other. Only two men lived in the High Street Residence. Grayeb actually maintained his residence at the High Street Residence. Therefore, a plain reading of § 3603(b)(2) shows that the High Street Residence falls within the exemption.

Lunini claims that the exception must be read narrowly, and the § 3603(b)(2) exception does not apply to a single family residence. Nothing in § 3603(b)(2) indicates that a single family home, which is occupied by the owner would not fall under the exception. It is true that a separate exemption exists for the sale or rental of single family homes, but under that exemption there is no requirement that the owner occupy that home. 42 U.S.C. § 3603(b)(1). The Court finds that a single family home that is occupied by the owner, is exempt pursuant to § 3603(b)(2), from the restrictions of § 3604. Lunini has cited to no authority stating that the exemption does not apply to a single family home, and thus the High Street property is exempt.

### B. Monroe Street Apartments

Lunini also claims that Grayeb violated the FHA because he extracted (Count V) and intended to extract (Count VII) sexual favors from Lunini as a condition of becoming or remaining in possession of the Monroe Street Apartments. Grayeb also engaged in sexual harassment housing discrimination by creating a hostile and offensive environment at the Monroe Street Apartments (Count VI). It is undisputed that Lunini and Grayeb purchased the Monroe Street Apartments as a business venture. Grayeb claims that the Fair Housing Act does not apply to the Monroe Street Apartments because business transactions between parties for commercial property, including apartments, in which neither party resides, do not fall

under the Fair Housing Act. *Shaikh v. City of Chicago,* 2001 WL 123784 (N.D.Ill. Feb.13, 2001).

In *Shaikh,* the plaintiff wanted to purchase an apartment building owned by the Department of Housing and Urban Development. *Id.* The plaintiff claimed that the City of Chicago interfered with the sale, in violation of the FHA, because of plaintiff's membership in various protected classes. *Id.* The district court ruled that even if the building was considered a "dwelling" under the FHA, the Act does not apply to a property which the purchaser is buying as a commercial venture, and in which he does not intend to live. *Id.* at *4. The court noted that there are certain instances when a person may sue under the FHA even if he did not intend to live in the dwelling. *Id.* at *3. However, those cases are limited to situations in which the plaintiff is asserting the rights of protected minorities who would be denied the right to live in the property in violation of the FHA. *Id.* Since Mr. Shaikh was not asserting the rights of those who intended to live in the apartment building, and he himself did not intend to live in the apartment building, the FHA did not apply. *Id.* at *3, 4.

Lunini claims that *Shaikh* was wrongly decided because the FHA must be broadly construed, and the case law focuses on the discriminatory conduct as opposed to the status of the injured person. The Seventh Circuit has held that the FHA is concerned with the furtherance of equal housing opportunity and elimination of segregated housing. *South–Suburban Housing Center v. Board of Realtors,* 935 F.2d 868, 882 (7th Cir.1991). The FHA itself states that it is United States policy "to provide, . . . for fair *housing* throughout the United States." 42 U.S.C. § 3601 (emphasis added).

This Court agrees with the ruling in *Shaikh* and finds that the FHA does not

apply to commercial ventures in which the party alleging discrimination did not intend to reside. Even the broadest reading of the FHA would not cover the Monroe Street Apartments in this situation. It is true that a plaintiff need not live or intend to live in the dwelling provided he is advancing the rights of those who live or intend to live in the housing subject to the suit. *See, Shaikh* at *3. However, that is not the case here. Lunini is not advocating for the rights of potential residents of the Monroe Street Apartments. Instead, he is claiming that his own exclusion from the business venture in the Monroe Street Apartments violates the FHA, even though there is no evidence Lunini intended to live there.[9] Such a business venture falls outside the parameters of the FHA, and any exclusion by Grayeb of Lunini from the Monroe Street Apartments did not violate the FHA as a matter of law.

In sum, pursuant to § 3603(b)(2), the High Street Residence is exempt from the discrimination prohibitions set forth in § 3604. The exclusion of Lunini from the Monroe Street Apartments is not covered by the FHA. Therefore, all of Lunini's FHA claims fail as a matter of law.

**VI. *Count IX: Assault and Battery Claim (as to Grayeb only)***

Count IX alleges a supplemental state law claim for assault and battery. A defendant has committed battery if he acts intending to cause harmful or offensive contact with a plaintiff's person, and did indeed cause such harmful contact. *Cohen v. Smith,* 269 Ill.App.3d 1087, 1090, 207 Ill.Dec. 873, 648 N.E.2d, 329, 332

(1995), *quoting Restatement (Second) of Torts,* § 13 (1965). Assault is defined as "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish by Bowker v. Donahue,* 110 Ill. App.3d 1081, 1083, 66 Ill.Dec. 860, 443 N.E.2d 786, 788 (1982). Given the fact that Lunini claims he was hit three times by Grayeb on the morning of June 30, 2000, there is a genuine issue of fact as to whether Grayeb assaulted and battered Lunini. Therefore, summary judgment is not warranted on Count IX.

## *CONCLUSION*

For the reasons stated above, Defendant Grayeb's Motion for Summary Judgment (d/e 144) is ALLOWED, IN PART. The City Defendants' Motion for Summary Judgment (d/e 143) is ALLOWED, IN PART. Both Motions for Summary Judgment are DENIED as to Count II to the extent that Count II states an *Esmail* equal protection claim over the failure to arrest Grayeb and DENIED as to Count III, to the extent that Count III alleges a claim for conspiracy to deny equal protection to Lunini for the failure to arrest Grayeb. Grayeb's Motion is DENIED as to the Count IX claim for assault and battery. The Motions for Summary Judgment are allowed in all other respects.

IT IS THEREFORE SO ORDERED.

---

9. Lunini claims that "by asserting his ownership of the Monroe Street property and defeating Grayeb's grab for total control of that property, Lunini is advancing the interests of other men who, as prospective tenants, may fall prey to Grayeb's sexual harassment." *Response to Grayeb's Motion for Summ. Jmt.,*

(d/e 152) p. 33. This blanket assertion does not save Lunini's claim as to the Monroe Street Apartments, since Lunini has pointed to absolutely no evidence of prospective male tenants that "may fall prey to Grayeb's sexual harassment."