**UNITED STATES of America,**
**Plaintiff,**
v.
**HUGHES MEMORIAL HOME,**
**a corporation, Defendant.**
**Civ. A. No. 75–0005.**

United States District Court,
W. D. Virginia.
May 2, 1975.

**546**

Frank E. Schwelb, Chief, Housing Section, U. S. Dept. of Justice, Washington, D. C., for United States.

James F. Ingram, Danville, Va., for defendant.

## DECREE

DALTON, District Judge.

The Attorney General filed this action on January 30, 1975 alleging that the defendant, a Pittsylvania County, Virginia children's home, had made dwellings unavailable to black children, in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq.* On February 12, 1975, defendant filed a motion to dismiss the complaint, or, in the alternative, for summary judgment. On February 21, 1975, the Court denied the motion, but reserved the right to reconsider its decision at a later stage of the proceeding. The Court requested the parties to act expeditiously to develop the factual and legal issues involved.[1]

Pursuant to the Court's direction, plaintiff took the depositions of T. Anthony Pollard, defendant's Executive Director, and of Ernest Baxa and Clyde S. Cassels, the President and Vice-President, respectively, of defendant's Board

---

1. 42 U.S.C. § 3614 requires that cases of this kind be "in every way expedited."

of Trustees. Plaintiff had also served on defendant a Request for Admissions, to which defendant responded by admitting or substantially admitting each of the statements in the Request. The principal facts in this proceeding are therefore not in dispute, but the parties differ as to whether defendant is covered under the provisions of the Fair Housing Act.

Based on the evidence in the record, the Court makes the following Findings of Fact, Conclusions of Law and Decree:

## FINDINGS OF FACT

1. The Hughes Memorial Home (hereinafter the Home) is a private, non-sectarian children's home located in Pittsylvania County, Virginia, outside the City of Danville. The Home was established pursuant to a trust set up by the will of John E. Hughes, a resident of Danville, which will was admitted to probate April 3, 1922. The provision of Mr. Hughes' will here pertinent is set out in the margin.[2]

2. Pursuant to the will of Mr. Hughes, the Home is governed by a Board of Trustees, of which the president is currently Mr. Ernest Baxa. The Home is managed in its day-to-day operations by its Executive Director, Mr. T. Anthony Pollard, who has occupied that position since 1947. Both of these gentlemen testified on deposition concerning the history and current operation of the Home.

3. As it is presently operated, the Home is open to needy and dependent children, whether orphans or not, who are determined to be in need of a residence at the Home because of unsatisfactory conditions in their families.

Pollard deposition at 11–12. Some children are referred to the Home by courts or social agencies, while others are admitted on the application of their parents or guardians. *Id.* at 11. Parents and guardians are requested to pay to the Home a monthly sum of money to defray some of the cost of the child's care, and most in fact make such payments. *Id.* at 29–30. Once admitted, the children are permanent residents rather than transients, and the average length of stay is about four years. *Id.* at 23–24.

4. The ages of the children in residence at the Home range from six to eighteen years. Pollard deposition at 21. The children are housed in dormitory fashion in five "cottages", under the supervision of resident house parents. *Id.* at 14. The maximum total capacity of these houses is approximately 60 children.[3] Pollard deposition at 33. At present, approximately 36 children reside there. A dining hall, a gymnasium, and other facilities are also located on the grounds of the Home. *Id.* at 18. The children attend the schools which serve the area generally. *Id.* at 5.

5. Throughout the history of the Home, its Trustees have interpreted the clause in the will of Mr. Hughes which provides that the institution shall be established "for the white children of Virginia and North Carolina" as forbidding them to admit blacks as residents. Defendant's Response to Plaintiff's Request for Admissions (hereinafter Req. Adm.), paragraph 2A; Baxa dep. at 39; Cassels dep. at 48. One application, filed by Robert H. Turner of Danville on behalf of his grandson, a black child, was rejected by the Home for this ex-

2. The will provides:
". . . I also give and bequeath unto my said executors the sum of Two Million Five Hundred Thousand Dollars to be used and disposed of by them upon the following trust, to-wit; that they cause to be created under the laws of the State of Virginia a corporation, to be properly named, for the purpose of establishing, organizing and maintaining an orphanage for the white children of the States of Virginia and North Carolina. . . ."

3. Mr. Pollard testified that the Home had its maximum number of residents, approximately 60 or 70 at about the time defendant declined to sign a nondiscrimination statement. Pollard deposition at 33. Since then, occupancy has dropped off by 40% to 50%. *Id.* at 33.

plicitly racial reason on April 18, 1973. Req.Adm. para. 2H.

6. The Home formerly received referrals of children from various public welfare departments, which are now unable by reason of equal opportunity requirements to make such referrals because of the defendant's policy of not admitting black children. Pollard deposition at 28; Req.Adm. para. 2F. At one time approximately half of the residents of the Home were referred to it by such agencies. Pollard deposition at 32. The present inability of the Home to accept such referrals is at least partly responsible for the fact that it now operates substantially below capacity. *Id.* at 34–35.

7. Prior to 1965, the Home received surplus agricultural commodities under the Surplus Commodity Program and the Special Milk Program of the Department of Agriculture. Pollard deposition at 24–28. In that year, it was brought to the defendant's attention that future participation in these programs was to be available only to institutions with nondiscriminatory admissions policies. *Id.* at 27–28. Believing themselves to be foreclosed from adopting such a policy by the will of Mr. Hughes, the trustees elected to withdraw from the programs and have not participated since. *Id.* at 28; Req.Adm. para. 20. The assistance thus foregone was financially helpful to the Home, although Mr. Pollard was unable to estimate its precise value. Pollard deposition at 27. During the past fiscal year, the Home operated at a net loss of $29,000. Cassels dep. at 46.

8. The United States has not alleged that the officers of the Home have acted out of malice or bad faith in refusing to accept black children. The Court finds that they have acted throughout in the good faith belief that the terms of Mr. Hughes' will required them to keep the Home all-white. The defendant's policy has nevertheless had the purpose and effect of excluding black children from residence of the Home. Although the record discloses the identity of only one black child on whose behalf an application has been made and rejected, that child was excluded on overtly racial grounds, and it may reasonably be inferred other black children would have been referred to the Home by social welfare agencies if the defendant had not followed a "white only" admissions policy.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 28 U.S.C. § 1345 and 42 U.S.C. § 3613.

2. The Fair Housing Act of 1968 is a constitutional exercise of Congressional power under the Thirteenth Amendment to bar discrimination in housing. *United States* v. *Hunter,* 459 F.2d 205, 214 (4th Cir. 1972), *cert. denied* 409 U.S. 934, 93 S.Ct. 235, 34 L. Ed.2d 189 (1972). The Act implements a policy to which Congress has accorded the highest national priority, and is to be construed liberally in accordance with that purpose. 42 U.S.C. § 3601; *Trafficante* v. *Metropolitan Life Insurance Co.,* 409 U.S. 205, 211–212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Mayers* v. *Ridley,* 151 U.S.App.D.C. 45, 465 F.2d 630 (1972) (en banc). Good faith is no defense to practices prohibited by the Act which have a racially discriminatory effect. *Williams* v. *Matthews,* 499 F.2d 819, 826 (8th Cir. 1974) *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974); *United States* v. *City of Black Jack,* 508 F.2d 1179, 1184–1185 (8th Cir. 1974); see *Griggs* v. *Duke Power Co,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

3. The defendant asserts that the Fair Housing Act does not apply. The Act makes it unlawful to make "dwellings" unavailable because of race. The term "dwelling" is defined by the Act as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families." 42 U.S.C. § 3602(b). "Family" includes a single individual. 42 U.S.C. § 3602(c).

Whether the Home is within the scope of the prohibition in section 3604(a) thus turns on whether it is "occupied as . . . a residence."

4. The term "residence" is not specifically defined in the Act, and must be accorded its ordinary meaning. The applicable definition of the word in Webster's Third New International Dictionary is as follows:

> a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit [.]

The record establishes that, as the very title of the institution implies, the Home is far more than a place of temporary sojourn to the children who live there, and that they are in fact, as the Home's officials refer to them, residents. The children go to school, outside the Home, Pollard deposition at 5, but live at the residential facilities provided by the Home. Executive Director Pollard described the Home in his deposition as a "residential center" for dependent, neglected or needy children. *Id.* at 5. The Court therefore holds that the Home is a dwelling within the meaning of section 3602(b).

5. Defendant contends that the activities of the Home are not covered by the Act because it is not engaged in the commercial sale or rental of residential facilities. While the Home receives some payment on behalf of 80%–90% of the residents, the Court concludes that the Act also reaches noncommercial activities, and that the Home is prohibited from discrimination even with respect to residents for whom no payment is made.[4] In *United States* v. *City of Parma*, O.H.Rptr. para. 13,616, at p. 14015 (N.D.Ohio 1973), appeal from later Order dismissed No. 74–1643 (6th Cir., September 26, 1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 768 (March 31, 1975), the defendant urged that since it was not being charged with discrimination in the sale or rental of dwellings, 42 U.S.C. § 3604, or in the financing of dwellings, 42 U.S.C. § 3605, or in providing access to opportunities in the real estate brokerage services, 42 U.S.C. § 3606, it could not, as a matter of law, be deemed to have violated any prohibition contained in the Fair Housing Act.

The Court held:

> While it is true that the allegations of the Government's complaint do not charge defendant specifically with refusing to sell or rent dwellings on racial grounds, the prohibitions contained in Section 3604(a) are clearly not so limited. Section 3604(a) not only makes it unlawful to 'refuse to sell or rent . . .' a dwelling for racial reasons, but also makes it unlawful to 'otherwise make unavailable or deny a dwelling to any person because of race, color, religion, or national origin.' (Emphasis added.) This catch-all phraseology may not be easily discounted or de-emphasized. Indeed it 'appears to be as broad as Congress could have made it, and all practices which have the effect of denying dwellings on prohibited grounds are therefore unlawful.' *United States* v. *Youritan Constr. Co.*, [D.C.] 370 F.Supp. 643.[5]

6. Coverage under the Fair Housing Act is not limited to those who sell, rent, or finance real estate. The Act has been applied not only to persons selling or renting dwellings, but also to newspapers carrying advertisements, *United States* v. *Hunter, supra*; to registrars of deeds recording instruments containing racially restrictive covenants, *Mayers* v. *Ridley*, 151 U.S.App.D.C. 45, 465 F.2d 630 (1972); and to municipali-

4. Pollard deposition at 29–30.

5. The *Youritan* decision cited by the Court in *Parma* was recently modified as to one item of relief and otherwise affirmed at 509 F.2d 623, (9th Cir. 1975). For the proposition that the phrase "otherwise make unavailable or deny" is as broad as Congress could have made it, see also *Zuch* v. *Hussey*, 366 F. Supp. 553, 556 (E.D.Mich.1973).

**550**

ties engaging in zoning or discriminatory land use practices, *United States* v. *City of Black Jack, supra*; *United States* v. *City of Parma, supra.*

 7. Evidence that defendant's operations are covered by the Act is also established by the fact that Congress created a carefully limited exemption for certain religious organizations. This exemption is inapplicable by its terms to the operation of Hughes Memorial Home. 42 U.S.C. § 3607 provides that nothing in the Act shall:

> [P]rohibit a religious organization . . . from limiting the sale, rental or *occupancy* of dwellings which it owns or operates for *other than a commercial purpose* to persons of the same religion . . . *unless membership in such religion is restricted on account of race, color, or national origin.* (emphasis added)

8. Careful study of the language of § 3607 discloses the following:

(a) The exemption is limited to *religious* organizations;

(b) The use of the word *occupancy* demonstrates that the Act is concerned with transactions other than those involving sale or rental;

(c) The creation of only a limited exemption for dwellings owned and operated for *other than a commercial purpose* establishes that some noncommercial activities must be covered; and

(d) The limited exemption for those who give preference to their own coreligionists does not apply to those who discriminate on account of race, color, or national origin.[6] (emphasis added)

Hughes Memorial Home is not a religious organization, but is open to children of all creeds, and the religious exemption in § 3607 does not apply. Even if the Home were a religious organization, it would not qualify for the exemp-

tion because religion is not the basis for discrimination.

 9. The existence of the limited exemption for religious organizations demonstrates that charitable agencies not embraced by the exemption are covered by the Act. The Fourth Circuit Court of Appeals has held that, if possible, each phrase in the statute must be given effect, *United States* v. *Hunter, supra*, 459 F.2d at 210. Moreover, it is a well-recognized principle of statutory construction that exceptions to a general statute are to be strictly construed. *Hartford Electric Light Co.* v. *FPC*, 131 F.2d 953 (2nd Cir. 1942), *cert. denied*, 319 U.S. 741, 63 S.Ct. 1028, 87 L.Ed. 1698 (1943); *Great Atlantic and Pacific Tea Co.* v. *FTC*, 106 F.2d 667 (3rd Cir. 1939), *cert. denied*, 308 U.S. 625, 60 S. Ct. 380, 84 L.Ed. 521 (1940). In the words of Chief Justice Marshall, in the case of *Brown* v. *Maryland*, 25 U.S. [12 Wheat.] 419, 438, 6 L.Ed. 678 (1827),

> a rule of interpretation to which all assent, that the exception of a particular thing from general words, proves that, in the opinion of the lawgiver, the thing excepted would be within the general clauses, had the exception not been made.

In view of the Supreme Court's holding that the Fair Housing Act must be accorded a generous construction, *Trafficante* v. *Metropolitan Life Insurance Co., supra*, the general principle requiring the strict reading of exemptions from the Act applies here with even greater force.

 10. To prevail on the merits of this action, the United States must show that the defendants have either:

(a) engaged in a pattern or practice of resistance to the full enjoyment of the right to equal housing opportunity; or

(b) denied rights granted by the Act to a group of persons, which denial

---

6. Under this provision, a Roman Catholic establishment otherwise qualifying for the exemption would be permitted to give prefer-

ence to Catholics as against non-Catholics, but not to white Catholics over black Catholics.

raises a question of general public importance. 42 U.S.C. § 3613.

See *United States* v. *Hunter, supra; United States* v. *Bob Lawrence Realty Co.,* 474 F.2d 115, 122–123 (5th Cir. 1973), *cert. denied,* 414 U.S. 826, 94 S. Ct. 131, 38 L.Ed.2d 59 (1974).

■■■■ 11. To prove a pattern or practice of discrimination, the United States must show that the discriminatory conduct complained of was not an isolated, accidental, or peculiar departure from otherwise nondiscriminatory practices. See, e. g., *United States* v. *Pelzer Realty Co.,* 484 F.2d 438, 445 (5th Cir. 1973) *cert. denied,* 416 U.S. 939, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). Here, it is established that defendant's refusal to admit black children was the product of a policy dictated by the provisions of the will of John E. Hughes, and, the defendant's policy was maintained in the *bona fide* belief that it was legally required by the will. The demonstrated existence of a policy of discrimination is sufficient to constitute the pattern and practice, and it is unnecessary for the United States to prove numerous specific occasions on which the discriminatory policy was carried out. *United States* v. *Alexander and Cloutier Realty Co., et al.,* P.H.E.O.H.Rptr. para. 13,570 (N.D. Ga.1971); *United States* v. *Real Estate Dev. Corp.,* 347 F.Supp. 776 (N.D.Miss. 1972); *United States* v. *Raymond,* P.H. E.O.H.Rptr. para. 13,618 (M.D.Fla. 1973), also *United States* v. *Medical Society of South Carolina,* 298 F.Supp. 145, 152 (D.S.C.1969). Under these decisions, the acknowledgement by the defendant's representatives that they are bound by the racial restriction in the Hughes will is sufficient to entitle the United States to relief.

■■■■ 12. The defendant's refusal to sign nondiscrimination assurances, which made the Home ineligible to receive referrals (including nonwhite referrals) from various public agencies, has contributed to its discriminatory image and is itself persuasive evidence of the existence of a discriminatory pattern and practice. In *United States* v. *Real Estate Dev. Corp., supra,* a landlord who had refused to sign a nondiscrimination agreement with the Defense Department had therefore become ineligible to house servicemen, including blacks. A nearby military installation was a logical source of black and white servicemen who could have resided at the defendant's dwellings, and the Court found that the defendant had created and perpetuated a discriminatory image. Relying on this course of conduct and on the defendant's implicit admissions of a discriminatory policy, the Court held that the landlord had engaged in a pattern and practice of discrimination even though there was no proof that any identifiable black applicant had been denied housing. The Court said:

> In *United States* v. *Medical Society of South Carolina, supra,* involving discriminatory admission practices of a hospital, the defendants refused to agree to sign the necessary assurances, with representatives of the Department of Health, Education and Welfare, making them eligible for federal financ[ing] assistance. This was reported in the press, and, as a result, the defendants' general image was discriminatory. Even though defendants had no legal obligation to sign the assurances, the image so fostered, which defendants did nothing to offset, was held to sustain a finding of pattern or practice, although there were few, if any, post-Act applicants. While the defendant in this case has no legal obligation to sign a nondiscrimination agreement with the Air Force, his failure to do so under the circumstances of this case, even apart from the overt discriminatory acts and admissions, has the same consequences as the conduct found unlawful in Medical Society. 347 F.Supp. at 783.

■■■■ 13. 42 U.S.C. § 3613 authorizes injunctive relief in favor of the United States where there has been a denial of rights granted by the Act to a group

of persons and where the Attorney General has determined [7] that such denial raises an issue of general public importance. *United States* v. *Real Estate Dev. Corp.*, 347 F.Supp. at 785. As the Court of Appeals for this Circuit observed in *United States* v. *Hunter, supra,* 459 F.2d at 218, note 17:

> In contrast to the 1964 Act, a pattern or practice of resistance is not an indispensible prerequisite for relief. Relief may be based on a single (unintentional) violation of the Act when by that violation a group of persons are denied their statutory rights and the cases raises an issue of general public importance. Here the rights of all nonwhites looking for an apartment were abridged by the [two] illegal advertisements published in The Courier.

■ 14. In *United States* v. *Real Estate Dev. Corp., supra,* 347 F.Supp. at 784–785, the Court, in applying conventional principles of equity to the "second alternative" of § 3613, held that

> Since equity looks to the future, injunctive relief is also appropriate, even in the absence of a showing of past violations, where the defendants' conduct or statements threaten future violations. *Swift & Co.* v. *United States*, 276 U.S. 311, 326 [, 48 S.Ct. 311, 72 L.Ed. 587] (1928); *United States* v. *W. T. Grant & Co.*, 345 U.S. 629, 633 [, 73 S.Ct. 894, 97 L.Ed. 1303] (1953).

> Injunctive relief is appropriate in this case on the basis of defendants' discriminatory rejection of blacks, standing alone, and on the basis of their extrajudicial admissions of a discriminatory policy. The need for such relief is even more cogent when both of

these kinds of evidence are considered together. *United States* v. *Reddoch, supra,* slip opinion at 27.[8]

The defendant's admissions of following the discriminatory policy of the Hughes will, likewise require injunctive relief in the present case.[9]

■ 15. The President of the defendant's Board of Directors testified that the board "would attempt to continue operation of the Home regardless of the outcome [of this case] if this could be done in keeping with the laws of the State of Virginia and the federal laws." Baxa deposition at 42. It is likewise the aim of the United States that the Home continue to be operated, but that this be done on a racially integrated basis. It is well settled that the Fourteenth Amendment bars enforcement by the Commonwealth of a racial restriction like that contained in the will of Mr. Hughes. *Commonwealth of Pennsylvania* v. *Board of Directors of City Trusts*, 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957); *Sweet Briar Institute* v. *Button*, 280 F.Supp. 312 (W.D.Va.1967), *enforcing mandate in* 387 U.S. 423, 87 S. Ct. 1710, 18 L.Ed.2d 865 (1967).

■ The Court is mindful that Virginia law favors the application of the principle of *cy pres* to permit the continuation of charitable trusts in the face of changed conditions, and that where, as here a racial restriction is apparently merely incidental to the main purpose of the trust, *cy pres* has been so applied. *Smith* v. *Moore*, 225 F.Supp. 434 (E.D. Va.1963); *cf. Evans* v. *Abney*, 396 U.S. 435, 90 S.Ct. 628 (1970). The Court is of the opinion that Hughes Memorial Home is entitled to continue operations to effectuate the principal purpose of the trust created under the will of John

---

7. The Attorney General's determination of general public importance is not subject to judicial review. *United States* v. *Northside Realty Associates*, 474 F.2d 1164 (5th Cir. 1973); *United States* v. *Bob Lawrence Realty Co., supra,* 474 F.2d at 125, note 14.

8. The Court's reliance is on *United States* v. *Reddoch,* P.H.E.O.H. Rptr. para. 13,569 (S.

D.Ala.1972) *aff'd per curiam* 467 F.2d 897 (5th Cir. 1972).

9. In connection with the "groups of persons" denied rights secured by the Act, see *Trafficante* v. *Metropolitan Life Insurance Co., supra,* 409 U.S. at 209–210, 93 S.Ct. 364.

E. Hughes and the Court welcomes the defendant's determination to continue its commendable work in favor of needy children in the community irrespective of the outcome of this litigation.

## ORDER

Pursuant to the foregoing Findings of Fact and Conclusions of Law, it is hereby ordered, adjudged and decreed that the defendant, Hughes Memorial Home, shall carry out the general charitable intent of the will of John E. Hughes by continuing to operate Hughes Memorial Home in accordance with the general terms thereof, except that said Home shall henceforth be operated on a nondiscriminatory basis without regard to race, color, sex, religion or national origin. To that end, defendant Hughes Memorial Home, its officers, agents, employees and successors, and all those acting in concert or participation with any of them, are hereby permanently enjoined from:

1. Adhering or giving any force or effect to the provision of Mr. Hughes' will which purports to limit residency at the Home to white persons;

2. Making residency at Hughes Memorial Home, or the equal enjoyment of any incident or privilege of residency at said Home, unavailable to any person because of race, color, religion, sex or national origin;

3. Discriminating against any person in the terms or conditions of residency at Hughes Memorial Home, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex or national origin;

4. Making, printing or publishing any notice, statement or advertisement with respect to residency at Hughes Memorial Home which indicates any limitation, discrimination or preference based on race, color, religion, sex or national origin; and

5. Engaging in any conduct which has the purpose or effect of denying or abridging equal housing opportunity at Hughes Memorial Home without distinction based on race, color, religion, sex or national origin.

It is further ordered that the defendant shall adopt and implement the following program to promote equal housing opportunity:

6. Upon entry of this Order, defendant shall make available to any applicant, its application for admission procedure. The application shall contain a statement to the effect that Hughes Memorial Home is operated on an equal opportunities basis without regard to race, color, religion, sex or national origin, and, further, the defendant shall advise all applicants who have heretofore been refused on a discriminatory basis of the change in policy, and, further, that Hughes Memorial Home is now operated on an equal opportunities basis without regard to race, color, religion, sex or national origin.

7. Upon entry of this decree, a copy of same shall be mailed to the Clerk of the Juvenile and Domestic Relations General District Courts for the cities of Danville and Martinsville and the counties of Pittsylvania, Halifax and Henry in order that they be aware that the Home is not operated on an equal opportunities basis.

8. For a period of two years following the entry of this decree, the defendant shall maintain and retain records as to the name, address and race of every person from whom admission to residency at Hughes Memorial Home is sought, and of every person or agency engaged in seeking admission to residency for such person. Defendant shall also maintain and retain any and all records which constitute or contain information pertinent to defendant's obligations under this Order. The United States may inspect and copy these records at any and all reasonable times, but shall endeavor to minimize the inconvenience to defendant of such inspection and copying.

The Court retains jurisdiction of this action for all purposes.