HOME QUEST MORTGAGE LLC and Donna Huffman, Plaintiff,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, et al., Defendants.

No. 04–2066–JWL.

United States District Court, D. Kansas.

Oct. 12, 2004.

---

Ira Dennis Hawver, Ozawkie, KS, for Plaintiff.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiffs Donna Huffman and the company that she founded, Home Quest Mortgage, LLC (Home Quest), filed this lawsuit against defendants for their alleged actions after a fire damaged the building in which Home Quest's offices were located. Plaintiffs assert claims under the Fair Housing Act (FHA), 42 U.S.C. §§ 3604, 3605, conspiracy in violation of 42 U.S.C. § 1985, and state law causes of action. The matter is presently before the court on the defendants' motions to dismiss plaintiffs' claims (docs. 2 & 8). For the reasons explained below, the court will grant these motions in their entirety. Specifically, the court will dismiss plaintiffs' FHA and § 1985 claims on their merits and will

decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims.

## I. FACTS

The following facts are taken from the allegations in plaintiff's complaint and the court assumes the truth of these facts for purposes of analyzing defendants' motions to dismiss. Ms. Huffman is a real estate mortgage broker who founded Home Quest and began operating it out of her home in Oskaloosa, Kansas. As business expanded, Ms. Huffman purchased a two-story building on the center square in Oskaloosa to use for office space for Home Quest. In addition, the building provided her with residential rental income from the leased upstairs apartment. Her mortgage on the building required her to purchase insurance, and Ms. Huffman purchased a business insurance policy from defendant American Family Mutual Insurance Company (American Family) through defendant Linda L. Reiling, who was an independent broker and an agent of American Family.

On July 12, 2000, the building caught fire. It was not destroyed, but it suffered smoke damage that ruined interior and exterior finishes, telecommunications equipment, carpets, and furnishings. The fire also damaged the rental residence upstairs.

Plaintiffs turned in a claim to American Family. American Family immediately hired Chavez Cleaning and Restoration (Chavez), which was an American Family approved contractor, to begin performing fire remediation work on the building. Ms. Huffman had repeatedly expressed concerns about the quality of contractors the insurance company was going to hire for the work, and defendant William Klecan, American Family's claims adjuster, assured Ms. Huffman that Chavez was an "excellent" fire damage remediation contractor. Chavez set up ozone treatment machines and began working immediately and over the weekend to repair the damage to the building. The work required the building to be closed and it was unavailable to conduct Home Quest's business.

The following week, Mr. Klecan fired Chavez without consulting Ms. Huffman. Mr. Klecan explained that Chavez was "too expensive." The lack of office space negatively impacted Home Quest. The fire had occurred in mid-summer, during a peak time in the residential mortgage business; Ms. Huffman was trying to get Home Quest established in the Oskaloosa market; the lack of telecommunications equipment and functioning office space was giving clients a negative impression of Home Quest; and the situation was causing considerable stress to valuable employees. Ms. Huffman repeatedly asked Mr. Klecan to provide a temporary office facility as was provided for in the insurance contract. Mr. Klecan responded, "You little ladies can't be making that much money-it will be cheaper for us to pay your loss than to set you up." Mr. Klecan also repeatedly deceived Ms. Huffman by assuring her that "it would be just a few days and they'd be back." He also deceived Ms. Huffman by telling her that the delay was due to the insurance company's need to obtain competitive bids.

Meanwhile, unbeknownst to Ms. Huffman, American Family, Mr. Klecan, and defendant Mike Elliot, who was American Family's regional claims supervisor, were trying to persuade the fire marshal that Ms. Huffman had started the fire in the building. Messrs. Elliot and Klecan were trying to turn the investigation from the upstairs tenant, who had been in the process of being evicted for non-payment of rent at the time of the fire, to Ms. Huffman. American Family employees visited

people in the community, including merchants, and Mr. Klecan called businesses and Ms. Huffman's staff asking if they thought she had started the fire. They asked interviewees to verify that Ms. Huffman was "emotionally unstable" and had "financial problems," and attempted to elicit answers that negatively characterized Ms. Huffman's marital relationship. This made day-to-day operations between Ms. Huffman and her staff difficult, and eventually led to the loss of a valuable and difficult-to-replace experienced mortgage loan broker.

Eventually, American Family selected defendant Joe Little General Contractor, Inc. (Joe Little) to repair the building. Mr. Klecan assured Ms. Huffman that Joe Little was an American Family guaranteed contractor, and that all of Joe Little's work would be guaranteed and warranted by American Family. Home Quest was able to reoccupy the building after three weeks of cleaning and remediation. At that time, Ms. Huffman discovered that Joe Little had removed the contents of the basement without allowing her or her company to have a representative present. Mr. Elliot and the adjuster stated that Joe Little had kept a list of everything that had been thrown away, but when defendant Robert Joe Little was questioned about this he falsely stated that "nothing had been thrown away" by his company. In fact, numerous items were missing. Among these items was a top-of-the-line furnace with many years of operation left. Chavez had determined that this furnace had survived the smoke damage and was still fully functional despite the fire. Chavez had turned off the furnace to prevent it from being ruined by operation during Chavez's remediation work. Joe Little, however, had turned on the furnace and ruined it with continued use, then replaced it with an inferior unit that was not installed correctly. In addition, Joe Little had removed two truckloads which had included

an irreplaceable door to the safe, and other antique valuables were also missing.

Joe Little had not performed many of the operations that it charged for and some of Joe Little's remediation work was inadequate. It was revealed during a walk-through of the building that Joe Little's statement of charges were largely for work that had not been performed. Joe Little had not utilized materials that it had purchased and said that it had used on the job, and these materials were left at the site. Also, Joe Little stole Home Quest's paint stocks. Maria Cosper with Advisor Financial witnessed a walk-through in which Robert Joe Little admitted nothing had been done in the south room, which was contrary to what Joe Little's bill stated. After examining another room, Robert Joe Little got aggressive and halted the walk-through. Robert Joe Little and Joe Little had bid on the contract with American Family without having had any experience or skills in specialized fire and smoke remediation work. Robert Joe Little and Joe Little refused to do the upstairs part of the building. None of the telecommunications equipment worked properly after the smoke damage, and fax transmissions were illegible. Staff and clients experienced problems from the smell of smoke that permeated the building for the next two years. The ventilation systems were not cleaned, and Ms. Huffman had to argue with American Family's rejection of responsibility to clean the ventilation systems.

Also, despite the fact that American Family had hired and later fired Chavez without Ms. Huffman's consent, American Family refused to pay Chavez. Ms. Huffman first learned that American Family was not paying Chavez when a collection agency contacted her. Ms. Huffman pursued American Family and Mr. Elliot on a weekly basis for six months to try to get

American Family to pay the bill, but American Family refused to pay. Chavez ultimately turned Ms. Huffman over to collections, which caused two credit risks to be placed on her personal credit file. This prevented her from having access to the most competitive and preferred interest rates from some capital sources, resulting in decreased profitability and opportunity losses, endangering her licensing as a mortgage broker, and threatening her and Home Quest's annual certification by the Department of Housing and Urban Development (HUD).

Ms. Reiling, who was Ms. Huffman's insurance agent, refused to return to the building and view any of the problems associated with the unremediated smoke damage. Mr. Elliot likewise refused to come to the building and view the unremediated smoke damage. He insisted that Ms. Huffman release American Family's payments to Joe Little, even though the bills were fraudulent, because they were "men" and therefore deserved payment.

■ American Family also refused to reimburse Ms. Huffman for lost income during the time her office was closed to repair the fire damage because her income, which conformed to the financial information on her insurance application, "was too great for a woman owned business." American Family refused to accept any proof of lost income from Ms. Huffman.[1]

Based on these facts, plaintiffs asserts nine claims: (1) violations of the FHA, specifically 42 U.S.C. §§ 3604, 3605; (2) conspiracy to violate plaintiffs' civil rights under 42 U.S.C. § 1985; (3) negligence and breach of implied warranty against American Family and Messrs. Elliot and Klecan; (4) negligence and breach of implied warranty against Joe Little and Robert Joe Little; (5) breach of contract and duty of good faith and fair dealing against American Family; (6) bad faith refusal to settle claims of third parties against American Family; (7) failure to procure the protection and failure to perform the duties of a Kansas insurance agent against Ms. Reiling; (8) fraud; and (9) intentional infliction of emotional distress. In defendants' motions to dismiss, they ask the court to dismiss plaintiffs' claims against them on the grounds that plaintiffs' federal claims fail to state a claim on their merits, all of plaintiffs' claims are barred by the respective statutes of limitations, and the court should decline to exercise supplemental jurisdiction over plaintiffs' state law claims if the court dismisses the federal law claims.

## II. STANDARD GOVERNING A MOTION TO DISMISS

The court will dismiss a cause of action for failure to state a claim only when "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief," *Poole v. County of Otero*, 271 F.3d 955, 957 (10th Cir.2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or when an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S.

---

1. The remaining defendant is Harvey R. Pierce, who is the chairman and chief executive officer of American Family. Plaintiffs do not allege that Mr. Pierce was personally involved in the events recited above, but rather they allege that he is liable under the Sarbanes–Oxley Act for failing to have in place adequate controls to address gender discrimination in the handling of claims. Plaintiffs' complaint does not, however, assert a separate claim against Mr. Pierce, and therefore the court construes plaintiffs' claim against Mr. Pierce to be one for supervisory or derivative liability based on plaintiffs' discrimination claims against the other defendants. Because the court concludes that plaintiffs' complaint fails to state an actionable discrimination claim against the other defendants, plaintiffs complaint likewise fails to state a claim against Mr. Pierce.

319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The court accepts as true all well-pleaded facts, as distinguished from con-clusory allegations, and all reasonable in-ferences from those facts are viewed in favor of the plaintiff. *Smith v. Plati,* 258 F.3d 1167, 1174 (10th Cir.2001). The issue in resolving a motion such as this is "not whether [the] plaintiff will ultimately pre-vail, but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quotation omitted).

## III. ANALYSIS

For the reasons explained below, the court will grant defendants' motions on their merits with respect to plaintiffs' FHA and § 1985 claims because it appears beyond a doubt that plaintiffs can prove no set of facts that would entitle them to relief on those claims. Given the court's dismissal of plaintiffs' two federal law claims, the court will decline to exercise supplemental jurisdiction over plaintiffs' state law claims. The court declines to address defendants' statute of limitations arguments largely because plaintiffs' com-plaint does not allege with sufficient clarity the exact dates when a variety of events

occurred after plaintiffs were able to reoc-cupy the building such as the ventilation system cleaning issue, the ramifications of American Family's failure to pay Chavez, and American Family's refusal to reim-burse plaintiffs for lost income.

### A. Fair Housing Act Claim [2]

The Fair Housing Act (FHA) was enacted "to provide ... for fair hous-ing throughout the United States." 42 U.S.C. § 3601. Plaintiff's complaint alleg-es that defendants engaged in discrimina-tory housing practices in violation of two provisions of the FHA—42 U.S.C. §§ 3604, 3605.[3]

### 1. FHA Claim Under 42 U.S.C. § 3604

Title 42 U.S.C. § 3604 contains six subsections, and plaintiffs do not identify which of these particular subsections that they claim defendants violated. Plaintiffs' complaint does not even arguably state a claim under the last four of these subsec-tions, § 3604(c)-(f), and therefore the court will confine its analysis to the first two of these subsections, § 3604(a)-(b). These two subsections make it unlawful

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse

---

**2.** The court rejects the American Family de-fendants' argument that the court is without jurisdiction to address this claim pursuant to *Denny v. Hutchinson Sales Corp.,* 649 F.2d 816, 819–20 (10th Cir.1981). The Tenth Cir-cuit's decision in *Denny* rested upon a prior version of 42 U.S.C. § 3610(d) which is no longer in force given the substantial amend-ments made to the FHA by the Fair Housing Amendments Act of 1988, Pub.L. No. 100–430, 102 Stat. 1619 (1988) (codified in scat-tered sections of the FHA, 42 U.S.C. §§ 3601 *et seq.*).

**3.** The court also rejects the American Family defendants' categorical argument that the FHA does not apply to the business of insur-ance. This argument has been widely reject-ed with respect to § 3604 claims. *See Nation-*

*wide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1355–60 (6th Cir.1995); *NAACP v. Am. Fami-ly Mut. Ins. Co.,* 978 F.2d 287, 297–301 (7th Cir.1992); *Wai v. Allstate Ins. Co.,* 75 F.Supp.2d 1, 5–8 (D.D.C.1999); *Lindsey v. Allstate Ins. Co.,* 34 F.Supp.2d 636, 641–43 (W.D.Tenn.1999). In the only case from the Courts of Appeals to have reached a contrary result, *Mackey v. Nationwide Ins. Companies,* 724 F.2d 419, 423–25 (4th Cir.1984), has been superseded by regulations promulgated by the Department of Housing and Urban Develop-ment as explained in *National Fair Housing Alliance, Inc. v. Prudential Insurance Co. of America,* 208 F.Supp.2d 46, 55–57 (D.D.C. 2002). Notwithstanding this, the court is per-suaded for reasons explained *infra* that § 3605 does not govern the business of insur-ance.

to negotiate for the sale or rental of, *or otherwise make unavailable* or deny, *a dwelling* to any person because of race, color, religion, sex, handicap, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a *dwelling,* or in the *provision of services* or facilities in connection therewith, because of race, color, religion, sex, handicap, familial status, or national origin.

42 U.S.C. § 3604 (emphasis added). Defendants arguably violated these provisions in the sense that they failed to promptly make the building available to plaintiffs allegedly because of Ms. Huffman's gender, and allegedly discriminated against plaintiffs on the basis of Ms. Huffman's gender in the manner in which they provided services in connection with the building. Section 3604, however, only applies to discrimination in connection with a "dwelling."

The FHA defines the term "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof." *Id.* § 3602(b). The FHA does not further define the term "residence," but courts have widely followed the definition of this term as first set forth in *United States v. Hughes Memorial Home,* 396 F.Supp. 544 (W.D.Va.1975), in which the district court defined "residence" as "a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit." *Id.* at 549. Giving the terms "dwelling" and "residence" a generous construction in order to further the broad remedial purposes of the FHA, courts have held that the

term dwelling includes, for example, cooperative apartment buildings, *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036 (2d Cir.1979), a children's home, *Hughes Memorial Home,* 396 F.Supp. at 548–49, a shelter for battered women, *Woods v. Foster,* 884 F.Supp. 1169, 1173–74 (N.D.Ill. 1995), a group home for recovering drug addicts and alcoholics, *City of Edmonds v. Oxford House, Inc.,* 514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995), seasonal bungalows, *United States v. Columbus Country Club,* 915 F.2d 877, 880–81 (3d Cir.1990), migrant worker cabins, *Lauer Farms, Inc. v. Waushara County Bd. of Adjustment,* 986 F.Supp. 544, 557–59 (E.D.Wis.1997), and a former office building converted to a hospice facility for AIDS patients, *Baxter v. City of Belleville,* 720 F.Supp. 720, 731 (S.D.Ill.1989). The term "dwelling" does not, however, extend to include lodging for transient guests such as a motel, *Patel v. Holley House Motels,* 483 F.Supp. 374, 381 (S.D.Ala.1979), or a bed and breakfast, *Schneider v. County of Will,* 190 F.Supp.2d 1082, 1086–87 (N.D.Ill. 2002). Further, the term "dwelling" does not, on its face, include commercial real estate such as a shopping center, *Weingarten Realty Investors v. Albertson's, Inc.,* 66 F.Supp.2d 825, 849 (S.D.Tex.1999), *aff'd,* 234 F.3d 28 (5th Cir.2000) (unpublished table opinion), a grocery store, *Matsunaga v. Century 21 Stanmeyer Realtors,* No. 84 C 11018, 1985 WL 1113, at *1 (N.D.Ill. May 7, 1985), or vacant land held for commercial use, *United States v. Mintzes,* 304 F.Supp. 1305, 1309–10 (D.Md. 1969).

In this case, the two-story building contained Home Quest's office as well as the residential rental unit upstairs. Home Quest's office is commercial space and therefore that portion of the building is not a dwelling under the FHA. *See* 42 U.S.C. § 3602(b) (defining the term dwelling to

include any residential "building, structure, *or portion thereof*" (emphasis added)). Therefore, defendants' alleged discrimination is not actionable under the FHA insofar as it may have impacted the office space. It appears, however, the portion of the building containing the upstairs residential rental unit falls within the FHA definition of the term dwelling. Nonetheless, although that unit may be a dwelling, the allegations in the complaint reflect that Ms. Huffman did not nor did she ever intend to use this rental unit as a dwelling for herself, but rather that she purchased the rental unit ancillary to her purchase of the building to use as office space for Home Quest. In other words, her ownership of the rental unit was purely a commercial venture. The pivotal issue, then, is whether a person who owns residential property that constitutes a "dwelling" under the FHA, but who owns that property as a commercial venture and does not reside or intend to reside in the dwelling, can assert an FHA discrimination claim with respect to the dwelling.

■ Case law reflects that the answer to this question is: only if the property owner is asserting that the defendant engaged in unlawful discrimination against a person or class of persons who reside or would reside in the dwelling absent the unlawful discrimination. For example, in *Housing Investors, Inc. v. City of Clanton*, 68 F.Supp.2d 1287 (M.D.Ala.1999), a corporate real estate developer asserted an FHA claim based on the defendants' alleged discrimination against low income minority tenants who it was anticipated would live in the plaintiff's proposed development. *Id.* at 1297–1301. Likewise, in *Lauer Farms, Inc.*, farmers who wanted to build migrant worker camps asserted FHA claims. They did not assert those claims, however, based on the defendant's alleged discrimination against them, but rather based on the defendant's alleged racial and socioeconomic discrimination against the

migrant workers and their families who would likely be living in the camps. 986 F.Supp. at 557. Along this same line of cases is *Baxter*, in which the district court permitted the plaintiff, who was proposing to convert a former office building into a hospice facility for HIV-infected patients, to assert FHA claims based on the defendant's alleged discrimination against the potential residents of the facility who were HIV-infected and therefore considered to be handicapped under the FHA. 720 F.Supp. at 727–33. Also, in *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096 (3d Cir.1996), a corporate nursing home developer asserted a claim under a provision of the Fair Housing Amendments Act of 1988, which is the component of the FHA that addresses handicap discrimination, but the developer asserted the claim on the basis of the defendants' alleged discrimination against elderly handicapped persons who were expected to reside in the nursing home. *Id.* at 1100. By analogy, then, plaintiffs could assert an FHA claim based on defendants' alleged discrimination against a person who resided or was expected to reside in the upstairs residential rental unit. Plaintiffs, however, assert no such claim. Instead, they allege that defendants discriminated against Ms. Huffman in her capacity as a commercial property owner who had no intention of residing in the dwelling.

This type of claim has been rejected by other district courts. The first case to have considered similar circumstances was *Shaikh v. City of Chicago*, No. 00 C 4235, 2001 WL 123784, at *2–4 (N.D.Ill. Feb. 13, 2001). The plaintiff in *Shaikh* was an East–Asian, Muslim male who was born in India and who sought to purchase an apartment building in Chicago from HUD. *Id.* at *1. The sale did not go through, and HUD ultimately sold the building to a Caucasian, non-Muslim, non-Asian buyer. *Id.* The court acknowledged that the apart-

ment building was "a dwelling as defined by the FHA, albeit a dwelling that [the plaintiff] planned to buy as a commercial investment rather than as a home for himself," and the court emphasized that the plaintiff did not allege "that the defendants' conduct was motivated by the protected class status of anyone intending to inhabit the property." *Id.* at *3–*4. Given the purpose of the FHA, which is to further equal-housing opportunity and eliminate segregated housing, the court dismissed the plaintiff's FHA claim because "the FHA does not apply to the sale of residential property to a person who is buying the property as a commercial venture, has no intention of residing in the property, and is not suing on behalf of protected class members who would reside there." *Id.* Then, in *Lunini v. Grayeb,* 305 F.Supp.2d 893 (C.D.Ill.2004), another district court stated that it agreed with the district court's reasoning in *Shaikh,* and held that the FHA did not apply to a commercial venture in which the party alleging discrimination did not reside or intend to reside in the apartments and was not advancing the rights of potential residents. *Id.* at 914–15.

This court agrees with the district courts' holdings in *Shaikh* and *Lunini.* As discussed previously, the FHA broadly encompasses most residential property short of lodging for transient guests, but it does not extend to commercial property. Extending the FHA to prevent discrimination against a person who owns residential property as a commercial venture would do nothing to further the stated purpose of the FHA, which is to "provide for fair housing." 42 U.S.C. § 3601. Under such circumstances, there is no causal nexus between the alleged discrimination and the alleged denial of the use of a dwelling. Even if the commercial property owner suffers discrimination, the commercial property owner has not been denied any housing. In this case, as in *Shaikh* and

*Lunini,* plaintiffs were not denied the use of a dwelling because of defendants' alleged discrimination. Ms. Huffman owned the upstairs residential rental unit purely as a commercial endeavor. Accordingly, the complaint fails to state a claim upon which relief can be granted under the FHA, 42 U.S.C. § 3604.

### 2. *FHA Claim Under 42 U.S.C. § 3605*

■ The court will next consider the viability of the other aspect of plaintiffs' FHA claim under 42 U.S.C. § 3605. This provision of the FHA provides as follows:

(a) In general

It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined

As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing *other financial assistance—*

(A) for purchasing, constructing, improving, repairing, or maintaining a *dwelling;* or

(B) secured by *residential* real estate.

(2) The selling, brokering, or appraising of *residential* real property.

42 U.S.C. § 3605 (emphasis added). Plaintiffs allege that defendants are engaged in the business of residential real estate-related transactions and discriminated in the terms and conditions of those transactions.

■ It cannot be inferred from the allegations in the complaint that plaintiffs' claims against defendants Joe Little and Richard Joe Little arise from a residential real estate-related transaction as defined in this statute. Those two defendants did not make or purchase loans or provide anything to plaintiffs that could arguably be construed as financial assistance, nor did they sell, broker, or appraise any residential property. Plaintiffs' complaint therefore fails to state a claim against Joe Little and Richard Joe Little for this reason.

Plaintiffs' § 3605 claim against the American Family defendants presents a closer question because one district court has concluded that homeowners insurance constitutes "other financial assistance" within the meaning of the term "residential real estate-related transaction." In *National Fair Housing Alliance, Inc.*, 208 F.Supp.2d 46 (D.D.C.2002), the district court reasoned "that individuals are often unable to purchase or to maintain financing for homes without homeowners insurance. Without property insurance, most homeowners are unable to repair their homes when and if disaster should strike. For these reasons, insurance provides the financial assistance necessary to maintain a dwelling." *Id.* at 58. In so holding, the district court found a prior ruling by the Seventh Circuit on this issue to be unpersuasive. In *NAACP v. American Family Mutual Insurance Co.*, 978 F.2d 287 (7th Cir.1992), the Seventh Circuit quickly dispensed with an argument that § 3605 could be construed to address an insurer's redlining practices.[4] *Id.* at 297. The court explained:

> It would strain language past the breaking point to treat property or casualty insurance as "financial assistance"—let alone as assistance "for purchasing ... a dwelling." Insurers do not subsidize their customers or act as channels through which public agencies extend subsidies. They do not "assist" customers even in the colloquial sense that loans are "assistance" (a lender advances cash, with repayment deferred). Payment runs from the customer to the insurer. Insurance is no more "financial assistance" than a loaf of bread purchased at retail price in a supermarket is "food assistance" or a bottle of aspirin bought from a druggist is "medical assistance."

*Id.*; see also Doukas v. Metropolitan Life Ins. Co., 882 F.Supp. 1197, 1201–02 (D.N.H.1995) (holding mortgage disability insurance does not constitute "financial assistance" within the meaning of § 3605), superseded by statute on other grounds as stated in Munroe v. Compaq Computer Corp., 229 F.Supp.2d 52, 66–67 (D.N.H. 2002).

After considering these two differing points of view on this issue, the court finds the position taken by the Seventh Circuit to be more persuasive primarily because the Seventh Circuit's opinion focuses on the ordinary meaning of the term "financial assistance." Financial assistance connotes, as suggested by the Seventh Circuit in *American Family*, a type of subsidy or perhaps issuance of tax-exempt bond financing, see *United States v. Massachusetts Indus. Fin. Agency*, 910 F.Supp. 21, 28–29 (D.Mass.1996) (holding tax-exempt bond financing falls under § 3605's umbrella of "financial assistance"). Insurance, on the other hand, is a form of financial protection, not financial assistance. *See Doukas*, 882 F.Supp. at 1202. Thus, in this case, none of the American

---

**4.** " 'Redlining' is charging higher rates or declining to write insurance for people who live in particular areas (figuratively, sometimes literally, enclosed with red lines on a map)." *NAACP*, 978 F.2d at 290.

Family defendants were providing plaintiffs with "financial assistance" with respect to the building such that their actions could be deemed to fall within the definition of a "residential real estate-related transaction."

■ The court also finds that plaintiffs' complaint fails to state a claim under § 3605 for the additional reason explained in detail previously with respect to her § 3604 claim, which is that § 3605 by its plain terms applies only to a "dwelling" or "residential real estate." Although Ms. Huffman allegedly suffered gender discrimination at the hands of the defendants, that discrimination did not occur in conjunction with a dwelling or residential transaction insofar as she was concerned. She owned the building purely as a commercial endeavor. Further, she never intended to inhabit the upstairs residential rental unit and she is not asserting discrimination claims on behalf of anyone who lived or sought to live in that unit.

For all of these reasons, then, the court concludes that it appears beyond doubt that plaintiffs cannot prove any set of facts which would entitle them to relief under the FHA. Accordingly, plaintiffs' complaint fails to state a claim upon which relief can be granted under the FHA, and therefore defendants' motions to dismiss this claim are granted.

## B. *42 U.S.C. § 1985 Claim*

■ The various clauses of § 1985 address several broad categories of conduct. Specifically, the statute

prohibits conspiracies to interfere with the performance of duties by federal officers (§ 1985(1)), with the administration of federal courts (§ 1985(2), first part), with the administration of state courts (§ 1985(2), second part), with the duties of a state officer (§ 1985(3), second clause), and with the right to support candidates in a federal election (§ 1985(3), third clause).

*United Bhd. of Carpenters v. Scott,* 463 U.S. 825, 839 n. 1, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983) (Blackmun, J., dissenting); *see also Kush v. Rutledge,* 460 U.S. 719, 724–25, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (discussing some of these same categories). None of these five categories of conduct are implicated in this case. The only plausible basis for plaintiffs' § 1985 claim, then, is the remaining category of conduct which is addressed by the first part of § 1985(3).

■ The first part of § 1985(3) prohibits persons from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons equal protection under the laws." 42 U.S.C. § 1985(3). Because § 1985(3) is not intended to serve as a "general federal tort law," *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), it does not itself create any substantive rights but rather merely serves as a vehicle for vindicating some otherwise defined federal right, *Great Am. Fed. Sav. & Loan Ass'n v. Novotny,* 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Thus, in order to state a claim for a private conspiracy under this part of § 1985(3), the plaintiff must allege, *inter alia,* that the conspiracy was: (1) motivated by a class-based invidiously discriminatory animus; and (2) " 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.' " *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 267–68, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (quoting *United Bhd. of Carpenters,* 463 U.S. at 833, 103 S.Ct. 3352); *accord Tilton v. Richardson,* 6 F.3d 683, 686 (10th Cir.1993). To date, the Supreme Court has recognized only two rights that are protected against private action under § 1985(3): the right to be

free from involuntary servitude and the right of interstate travel in the context of the Thirteenth Amendment. *Bray*, 506 U.S. at 278, 113 S.Ct. 753; *Tilton*, 6 F.3d at 686–87.

In this case, plaintiffs allege that defendants' actions were motivated by animus based on Ms. Huffman's gender. The court will assume without deciding that the allegations in plaintiffs' complaint are sufficient to satisfy the first element of class-based invidiously discriminatory animus. Plaintiffs' allegations are nonetheless clearly insufficient to satisfy the second element, i.e., that defendants' actions were aimed at interfering with rights of plaintiffs that are federally protected from private action. Plaintiffs have failed to identify any specific federal right that they believe defendants conspired to violate. The court cannot infer from the facts alleged that defendants conspired to violate plaintiffs' right to be free from involuntary servitude or the right of interstate travel, which very well may be the only circumstances under which plaintiffs' complaint could arguably state a claim under § 1985(3). Construing the allegations in the complaint in the light most favorable to plaintiffs, as the court must at this procedural juncture, it appears that plaintiffs are alleging an unconstitutional deprivation of property and contract rights. The Supreme Court has never held that any such rights are protected against private action and, accordingly, plaintiffs have failed to allege any set of facts that would entitle them to relief under § 1985(3). *See Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir.2001) (holding alleged deprivation of property and contract rights cannot be vindicated under § 1985(3)).

### C. Pendent State Claims

 Plaintiffs filed this lawsuit invoking this court's federal question jurisdiction and supplemental jurisdiction over plaintiffs' state claims. *See* Compl. (doc. 1)

¶ 2, at 1 (alleging jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367). Having granted defendants' motions to dismiss plaintiffs' federal law claims and mindful that discovery has not yet begun in this case, the court declines to exercise supplemental jurisdiction over plaintiffs' pendent state claims. *See* 28 U.S.C. § 1367(c)(3) (providing that the district court may decline to exercise supplemental jurisdiction over state law claims where it has dismissed all claims over which it had original jurisdiction); *Tonkovich v. Kansas Bd. of Regents*, 254 F.3d 941, 945 (10th Cir.2001) (noting that considerations of judicial economy, convenience, and fairness do not favor retaining jurisdiction where there has been a relative lack of pretrial proceedings and a total absence of discovery); *Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir.1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motions to dismiss (docs. 2 & 8) are granted and this case is dismissed in its entirety.